**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Manuel Nicholas DIAZ,
Defendant-Appellant.**

**No. 86–1704.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 21, 1986.

Decided March 16, 1987.

Rehearing and Rehearing En Banc
Denied April 28, 1987.

Terry G. Harn, Peoria, Ill., for defendant-appellant.

Mark D. Stuaan, Asst. U.S. Atty., Peoria, Ill., Gerald D. Fines, U.S. Atty., Springfield, Ill., for plaintiff-appellee.

Before POSNER and FLAUM, Circuit Judges, and GRANT, Senior District Judge.*

FLAUM, Circuit Judge.

Defendant Manuel Diaz was convicted of five drug-related offenses arising out of his sale of cocaine to an undercover agent. On appeal he argues, among other things, that the police's entry into his hotel room without either a search warrant or an arrest warrant violated the Fourth Amendment. Diaz therefore argues that his arrest was unlawful, and that physical evidence obtained by the police pursuant to their warrantless search should have been suppressed at trial as the fruit of a Fourth Amendment violation. We hold that the entry was lawful, and affirm Diaz's conviction.

I.

In the fall of 1984, Illinois law enforcement officials investigating Diaz's activities enlisted the help of a longtime acquaintance of Diaz named Diana Brown. At the direction of the police, Brown contacted Diaz at a gas station that he owned in Florida, and told him that she "had someone in Chicago that could buy from you." This buyer was in reality Agent John Mueller of the Northeastern Metropolitan Enforcement Group (NEMEG), an organization of state, local and county officers that investigates drug trafficking in Illinois. At a meeting between Brown and Diaz in Miami, and in several subsequent telephone conversations between Diaz and Mueller,

---

* The Honorable Robert A. Grant, Senior District Judge for the United States District Court for the Northern District of Indiana, is sitting by designation.

Diaz agreed to sell Mueller eight kilograms of cocaine at $43,000 per kilogram, for a total of $344,000.

On October 13, 1984, Brown and Diaz met in Chicago and were joined at dinner by Mueller. It was agreed at this dinner meeting that Mueller would come to Diaz's hotel the next morning to complete the transaction. Mueller would test a random sample of the cocaine, and if the results were satisfactory he would then have an hour to get the money to the hotel.

As arranged, Mueller arrived at the Westin Hotel in Rosemont, Illinois at 9:30 a.m. the following day, accompanied by agents from the Federal Drug Enforcement Administration, NEMEG, the Schaumburg Police, and the Rosemont Police. Diaz was staying in Room 809, and two of his confederates (later identified as Oscar Pintos and Ramon Sosa) occupied Room 808, which was adjacent to Room 809. For surveillance purposes, law enforcement agents had occupied Room 818, directly across the hall from Room 809, since about 1:30 p.m. the previous day.

Diaz admitted Agent Mueller to Room 809. Mueller noticed no one else in the room. Diaz left the room for a minute and returned with a cardboard box with open flaps. This box contained eight individually wrapped packages of white powder with yellow tape around them and a ninth package with white masking tape around it. Diaz told Mueller there was a ninth kilo in the box which he would give him on credit. Agent Mueller thanked him, removed one kilo from the box, and conducted a quick chemical test. He told Diaz "it looked good," and informed him he was going to the lobby to call his "money man" who would be there in about 30 minutes. Diaz responded that he would be waiting in his room for Mueller's call that the money had arrived.

Mueller left the hotel room. When the door was shut behind him, he gave a prearranged signal to the agents in Room 818, and then knocked on the door of Room 809 again. Diaz opened the door and Mueller said, "I forgot my keys and coat." Mueller testified that he was then pushed into the room by the surveillance team. Diaz testified, however, that Agent Mueller dropped to the ground at this point and that he, Diaz, bent over him to see what was wrong and was thereupon rushed by the surveillance team.

Agent Steven Livas of NEMEG grabbed Diaz and informed him that they were police officers and Diaz was under arrest. Diaz was walked back over to the bed, laid face down, handcuffed, and advised of his *Miranda* rights. Agent Livas then returned to the front of the room and observed, on top of the vanity outside the bathroom, a box containing packages of white powder. At this point he told the agents outside the door that there were drugs inside Room 809, and instructed them to arrest the men in Room 808.

Agent Livas then observed a gray flight bag with a brown shopping bag inside it on the floor of the open closet. He testified that both bags were open, and that he "opened the top" and observed bundles of money. He picked this flight bag up and carried it to the bed, where he dumped it out and began to count the money. The money in the bag came to approximately $136,000, and the white powder seized (later definitively identified as cocaine) came to approximately nine kilos.

Diaz was thereafter taken to the Rosemont Police Station where he was interviewed by Richard Levy, a felony prosecutor from the Cook County State's Attorney's office. Levy informed Diaz of his *Miranda* rights and then began to question him about the cocaine transaction that had just occurred. Diaz made a full confession.

Diaz was charged with five narcotics offenses arising from this incident, and was found guilty of all charges following a jury trial at which the money and the cocaine seized from his hotel room were admitted as evidence. He was sentenced to 25 years in prison without parole on Count I (continuing criminal enterprise); ten years on Count II (conspiracy to possess with intent to distribute and conspiracy to distribute cocaine); five years on Count III (interstate travel to further an unlawful enterprise); ten years on count IV (possession of co-

caine with intent to distribute); and ten years on Count V (distribution of cocaine), the sentences on the first four counts to run concurrently. In addition, the court imposed a special parole term of three years on each of counts IV and V, to run concurrently with one another. This appeal followed.

## II.

■ The principal issue in this case is whether the warrantless entry into Diaz's hotel room by law enforcement officers at the time of Diaz's arrest violated the Fourth Amendment. If this second entry was unconstitutional,[1] then Diaz's arrest was invalid, and the evidence of the money in the flight bag and the cocaine in the box should have been suppressed at trial under the exclusionary rule established to effectuate the Fourth Amendment, *see Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). We hold that because the second entry was lawful, Diaz's arrest was valid, and the district court's decision not to suppress the evidence of the money and the cocaine was correct. We also reject Diaz's other contentions.

We note initially that we are at a loss to understand why the police did not obtain at least a search warrant in this case. Diaz and his confederates had been under surveillance by law enforcement officers in Room 818 since the day before the arrest, and the officers knew that the purpose of this stay at the hotel was a drug transaction. It therefore would have been possible for the officers to obtain a search warrant for Rooms 808 and 809, and execute it when and if Agent Mueller, having entered Room 808 with Diaz's consent, stepped out into the hall and gave the signal. *See United States v. Paul*, 808 F.2d 645, 647

(7th Cir.1986). Even after the initial meeting in the hotel room between Diaz and Agent Mueller, there may well have been time to obtain both a search warrant for Diaz's room and a warrant for Diaz's arrest. Diaz had agreed to wait in his room for Agent Mueller to return with the money for the transaction, and Agent Mueller testified at trial that he told Diaz it would be at least a half-hour before he got back. Diaz presented evidence that a magistrate was on call that day, and that a telephone warrant could therefore have been obtained. *See* Fed.R.Crim.P. 41(c)(2)(A).[2] This option might well have been appropriate in light of the facts that Diaz's room was under surveillance and that there was no indication that he had been tipped off to the deception or that any person's life was or might be in danger. Nonetheless, because the police did not in fact obtain a warrant before entering Diaz's room, we must decide whether their warrantless entry violated the Fourth Amendment.

## A.

■ A threshold issue is whether *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), applies to this case. In *Payton*, the Supreme Court held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." 445 U.S. at 576, 100 S.Ct. at 1374. At oral argument, the government suggested that a hotel room secured for the purpose of a drug transaction does not carry with it the same privacy interest as does a suspect's home, and that *Payton* is therefore inapplicable.

In several cases decided before *Payton*, the Supreme Court stated that the Fourth Amendment protections against arbitrary search and seizure apply to individuals in

---

1. Only the second entry is at issue here, because the first entry of Agent Mueller into Diaz's hotel room was by consent and therefore clearly lawful. The fact that Mueller was not who he appeared to be did not void Diaz's consent. *See Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); *United States v. White*, 660 F.2d 1178, 1183 (7th Cir.1981).

2. Federal Rule of Criminal Procedure 41(c)(2)(A) reads in pertinent part:

   **(A) General Rule.** If the circumstances make it reasonable to dispense with a written affidavit, a federal magistrate may issue a warrant based upon sworn oral testimony communicated by telephone or other appropriate means.

hotel rooms as well as in homes. *See, e.g., Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964); *Lanza v. New York,* 370 U.S. 139, 143, 82 S.Ct. 1218, 1220, 8 L.Ed.2d 384 (1962). We do not believe that *Payton* altered the recognition that "[a] hotel room can be the object of Fourth Amendment protection as much as a home or an office." *Hoffa,* 385 U.S. at 301, 87 S.Ct. at 413. The doctrine of *Payton* therefore applies to this case. *See United States v. Jones,* 696 F.2d 479, 486 (7th Cir.1982), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983) (*Payton* applied to search of hotel room without discussion); *accord United States v. Rambo,* 789 F.2d 1289, 1295 (8th Cir.1986); *United States v. Baldacchino,* 762 F.2d 170, 175 (1st Cir.1985); *United States v. Bulman,* 667 F.2d 1374, 1384 (11th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982).[3]

### B.

Under *Payton* the police could not enter Diaz's hotel room without a warrant, even with probable cause, unless the entry was consented to, or unless there were "exigent circumstances," 445 U.S. at 590, 100 S.Ct. at 1382. The government argues, and the district court held, that there were exigent circumstances in this case that rendered the second entry lawful. We do not agree.

The Supreme Court has emphasized that the exceptions to the warrant requirement that fall under the doctrine of exigent circumstances are "few in number and carefully delineated," *Welsh v. Wisconsin,* 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) (*quoting United States v. United States District Court,* 407 U.S. 297, 318, 92 S.Ct. 2125, 2137, 32 L.Ed.2d 752 (1972)), and that it has recognized only a few such emergency conditions. *See, e.g., Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978)

(ongoing fire); *United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976) (hot pursuit of a fleeing felon); *Schmerber v. California,* 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966) (destruction of evidence). This circuit expresses the test for exigent circumstances as "whether the exceedingly strong privacy interest in one's residence is outweighed by the risk that delay will engender injury, destruction of evidence, or escape." *United States v. Acevedo,* 627 F.2d 68, 70 (7th Cir.), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 587, 66 L.Ed.2d 482 (1980); *see Llaguno v. Mingey,* 763 F.2d 1560, 1564 (7th Cir.1985) (en banc). "[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh,* 466 U.S. at 749–50, 104 S.Ct. at 2097–98; *see Acevedo,* 627 F.2d at 70.

■ The government argues that a number of factors came together to create exigent circumstances in this case: the need to preserve evidence, the need to secure three people in two different hotel rooms, the gravity of the offense, and the possible suspicions aroused if Agent Mueller had failed to return in time to complete the deal. The district court simply noted that, "in the context of the realities of drug transactions," Mueller and the other agents had no way of knowing what was occurring in Diaz's mind when Mueller left the room, and that there was "no reason to believe that Diaz might not become suspicious and destroy or dispose of the cocaine."

In the circumstances of this case we find it difficult to see the emergency. There was no indication that Diaz suspected Mueller of being an agent, or that he might destroy evidence. Indeed, he had stated an intention to wait in his room until Mueller returned with the money. Although "an important factor to be considered when determining whether any exigency exists is

---

**3.** The government's suggestion that we look to the suspect's purpose in securing the hotel room misses the point of the Fourth Amendment. "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society." *Wolf v. Colorado,* 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949). If the Fourth Amendment applies only to those who turn out to be innocent, that security is lost.

the gravity of the underlying offense for which the arrest is being made," *Welsh,* 466 U.S. at 753, 104 S.Ct. at 2099, "no exigency is created simply because there is probable cause to believe that a serious crime has been committed," *id.* Further, "[a] mere possibility that evidence will be destroyed ... is not enough. Otherwise the requirement of a warrant would have little meaning in the investigation of drug crimes." *United States v. Salgado,* 807 F.2d 603, 609 (7th Cir.1986). The importance of enforcing the drug laws cannot be an excuse for the erosion of basic constitutional protections.

However, even though there were no exigent circumstances here, we hold that Diaz effectively consented to the second entry by virtue of his consent to Mueller's first entry. Agent Mueller was in the hotel room with Diaz's consent, and the fact that Mueller momentarily stepped out to obtain help from other officers in making the arrest did not vitiate this consent.

*United States v. Paul,* 808 F.2d 645 (7th Cir.1986), supports our conclusion. In *Paul,* the individual who made the critical drug deal with defendant was a confidential informant rather than an undercover agent. The informant, equipped with an electronic transmitting device, was admitted to Paul's house for the purpose of buying marijuana. When the informant saw two bales of marijuana in the basement, he triggered the device; federal agents knocked on the door and then entered the house and arrested Paul. *Paul,* 808 F.2d at 647. We held that the entry of the agents was consensual, explaining that

"when one invites an undercover agent into his house, the agent can summon other agents to assist in the arrest, and the other agents are not guilty of a violation of the Fourth Amendment." *Id.* at 648.[4]

"Warrant requirements interpose the decision of a 'neutral and detached magistrate' to protect individuals from unfounded invasions of their privacy by *preventing* unwarranted intrusions." *United States v. White,* 660 F.2d 1178, 1183 (7th Cir.1981) (emphasis in original). In this case, as in *Paul,* such an independent determination would not have prevented the intrusion. Diaz would have admitted Agent Mueller back into the hotel room, and as in *Paul,* the fact that he was assisted by other law enforcement officers in securing his arrest cannot make a constitutional difference. We therefore hold that Diaz's consent to the first entry was not broken by Agent Mueller's brief exit to obtain help.

We emphasize that we have applied this doctrine of "consent once removed" only where the agent (or informant) entered at the express invitation of someone with authority to consent, at that point established the existence of probable cause to effectuate an arrest or search, and immediately summoned help from other officers. We do not intend to suggest by our analysis that one consensual entry means that law enforcement agents may thereafter enter and exit a home at will. In this case, however, the second entry was clearly lawful. Therefore, Diaz's arrest was valid, and there was no illegal search.

---

4. *Paul* followed two other "second entry" cases. In *United States v. White,* 660 F.2d 1178 (7th Cir.1981), two narcotics officers were admitted to White's apartment under the guise of heroin purchasers. One of the defendants left the apartment with one of the agents, and was arrested outside. Using the apartment keys obtained from the arrested man, police officers reentered White's apartment and arrested two other defendants. We upheld the district court's denial of White's motion to suppress the physical evidence obtained as a result of the second entry, because "it serves no purpose to require an arrest warrant where the same intrusion would occur whether or not the magistrate issued the warrant." *Id.* at 1183. Similarly, in *United States v. Janik,* 723 F.2d 537 (7th Cir.

1983), the defendant invited his friend Heidemann to his apartment to see a submachine gun he had purchased. Heidemann contacted agents at the Bureau of Alcohol, Tobacco and Firearms (ATF), and then went to the apartment. Janik let Heidemann into the apartment, where Heidemann saw the gun disassembled on a table. Because he could not make radio contact with the arrest team from inside the apartment's bathroom, Heidemann had to step into the lobby to tell the arrest team to come in. The ATF agents seized the submachine gun and a sawed off shotgun. We upheld the seizure of the guns, holding that "the fact that Heidemann got help from other officers in removing the submachine gun can make no difference." *Id.* at 548.

### C.

■ We must next decide whether the seizure of the cocaine and the money in the flight bag comes within the plain view doctrine of *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality). Under the plain view doctrine, police may seize an item without a warrant if three conditions are met. "First, the presence of the police in the area where they observe the item must be lawful. Second, the discovery of the item must be inadvertent. Finally, the criminal nature of the item must be immediately apparent." *Perlman v. City of Chicago,* 801 F.2d 262, 265 (7th Cir.1986); *see United States v. Reed,* 726 F.2d 339, 343 (7th Cir.1984). We have established that the presence of the police in Diaz's hotel room was lawful. Diaz does not dispute that the discovery by Agent Livas of the money and the white powder was inadvertent, and that the white powder was of an immediately apparent criminal nature.[5] However, Diaz argues that the criminal nature of the money in the flight bag was not immediately apparent, and that therefore the money does not fall within the plain view doctrine.

"The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Payton,* 445 U.S. at 587, 100 S.Ct. at 1380. In *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1982), the Supreme Court stated that in the plain view context, the probable cause standard:

> merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief" that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.

*Id.* at 742, 103 S.Ct. at 1543 (1982) (citation omitted). Under this standard, Agent Livas, knowing that Diaz was suspected of dealing in cocaine, had probable cause to believe that a large amount of cash might constitute evidence of a crime. *Cf. United States v. Reed,* 726 F.2d 339, 343 (7th Cir. 1984) (seizure of gold bar upheld because of a "logical nexus" between the gold and the cocaine named in the search warrant). The district court, therefore, was correct in allowing the money and the cocaine into evidence.

### III.

■ Because Diaz effectively consented to the entry into his hotel room by police officers, his arrest there did not violate the Fourth Amendment. Because the money and cocaine seized in the hotel room was in plain view, the trial court did not err in allowing it into evidence. The remainder of Diaz's claims on appeal are meritless.[6]

---

**5.** At the suppression hearing in this case, there was some dispute as to whether the money in the flight bag was literally in plain view when it was seized. However, the district court weighed the testimony before it and concluded that the money was in plain view, and Diaz does not press this point on appeal.

**6.** First, Diaz argues that his confession should be suppressed because of a "taint" stemming from four circumstances: his unlawful arrest; illegally seized evidence; an illegally obtained statement made by Diaz prior to his confession; and coercion. We have established that Diaz's arrest and the seizure of the money and cocaine from his hotel room were lawful. The prior statement to which Diaz refers was a remark that Diaz made, while being booked, to Special Agent Robert Fanter concerning the money found in the hotel room. Diaz argues that the remark was "illegally obtained" because Special Agent Fanter had not advised Diaz of his *Miranda* rights. However, the district court found

that Diaz had been given his *Miranda* rights several hours earlier, at the hotel. There was therefore no need to give them again at the booking. *See United States ex rel. Henne v. Fike,* 563 F.2d 809, 814 (7th Cir.1977), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1257, 55 L.Ed.2d 776 (1978) (nine hours between warning and waiver not too long). As to coercion, the district court found that Diaz's statement was voluntary based on a comparison of the credibility of the witnesses, and we have no reason to disturb this factual finding.

Second, Diaz raises a plethora of objections to evidentiary rulings by the district court. We have examined these objections and find them to be without merit. Third, Diaz argues that the court should not have allowed the government to use his proffer of testimony regarding his knowledge of the facts underlying the indictment to impeach his testimony at trial. However, Diaz concedes that the proffer agreement explicitly allowed for this use. Fourth, Diaz

Therefore, the judgment of the district court is AFFIRMED.

takes issue with the trial court's denial of a continuance which he requested in order to encourage a witness who was not under subpoena to appear. We find no abuse of discretion in the court's decision. Finally, Diaz claims that his indictment was legally insufficient and that his motion for acquittal should have been granted. These contentions are without merit.