**UNITED STATES of America, Plaintiff,**

v.

**Robert ANHALT and Walter Jachimko, Defendants.**

**No. 92 CR 538.**

United States District Court, N.D. Illinois, E.D.

Feb. 19, 1993.

Daniel George Martin, Federal Defender Program, George Joseph Murtaugh, Jr., Chicago, IL, for Walter Jachimko.

Patrick Sean Layng, U.S. Attorney's Office, Chicago, IL, for U.S.

## ORDER

BRIAN BARNETT DUFF, District Judge.

Mr. Walter Jachimko has been indicted for conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). The indictment is based upon the fruits of a warrantless search of Jachimko's residence conducted on June 30, 1992. Jachimko was arrested at the time of the search. Jachimko has moved to suppress the evidence seized during the search, claiming that the search was conducted without probable cause or consent. The court held a hearing on these claims on December 23, 1992, at which two witnesses testified: DEA Special Agent Scott Courtney and confidential informant Joseph Hendrickson. For the following reasons, Jachimko's motion to suppress is granted.

## FINDINGS OF FACT

The court has heard the evidence and has considered the testimony, exhibits, and arguments of counsel. Now fully advised in this matter, the court finds the following facts.

1. The Drug Enforcement Administration (DEA) began an investigation of defendant Robert Anhalt[1] and others, not including defendant Jachimko, in March of 1992. This investigation was triggered by a tip from Joseph Hendrickson, who approached the DEA offering information on individuals engaged in indoor marijuana cultivation.

2. Hendrickson mentioned to the DEA the names of defendant Robert Anhalt and his brother William Anhalt, as well as five other individuals, but never mentioned defendant Jachimko. In fact, the DEA agents assigned to the case never heard Jachimko's name until the night of the arrest, June 30, 1992. A background check on Hendrickson revealed prior convictions for delivery of cocaine and for escape. Hendrickson became a confidential informant ("CI") for the DEA, and received monetary compensation in return for his assistance.

3. The DEA began surveillance of Robert Anhalt in March 1992 in order to find corroboration for Hendrickson's information.

4. On March 24, 1992, Hendrickson arranged a meeting with Robert Anhalt at Robert's residence for the purpose of introducing Robert to DEA undercover agent Jodwalis. William Anhalt was also present at this meeting. Jodwalis told the Anhalts that he was interested in obtaining marijuana plants, and that he had plans for developing a large hydroponic growing operation and wanted Robert Anhalt to be a business partner in the venture. William stated that he had a large growing operation that he would be willing to show Jodwalis the next day.

5. On March 25, 1992, there was a meeting between Jodwalis, Robert, William, and undercover DEA agent Scott Courtney. The agents proposed to purchase plants from the Anhalts and to hire the Anhalts to set up the indoor growing operation and care for the plants. The Anhalts indicated interest at that time, but subsequently told Hendrickson that they were no longer interested in managing the growing operation.

6. The DEA, therefore, scaled back their aspirations, and decided to seek a simple purchase of marijuana plants from the An-

halts. On June 1, 1992, the CI, wearing a recording device, met with Robert at Robert's residence. The CI obtained two sample marijuana plants, and ordered 150 plants at $10 each. A week later, at another DEA monitored meeting, the CI gave Robert $150 as a down payment toward the plants, and arrangements were made for the CI to see the 150 plants that had been ordered on June 30, 1992.

7. On June 30th, DEA agents met with the CI in the vicinity of Robert's residence before he was to meet Robert to view the plants. The CI was given a recording device, which also allowed agents to monitor conversation, and an "Agent Alert button." The purpose of the alert button was to summon the surveilling DEA agents upon its activation. The CI was instructed to press the alert button only if he saw more than one hundred marijuana plants. The CI then went to Robert's residence; he stayed for ten minutes, returned to the meeting place with the agents alone, and then went back to Robert's apartment. The CI still had the recording device and the alert button, and his instructions did not change.

8. The anticipated pattern of the evening, however, did change. The CI and Robert left Robert's residence in a car, and they were followed by surveilling DEA agents. They drove to 4900 West Newport in Chicago, a location which had never been under DEA surveillance during the investigation. Agent Courtney testified that at the time the agents approached 4900 West Newport, they had no idea who lived there, or how many units were in the building. They did not know of any violations of any law taking place at that address.

9. After arriving at 4900 West Newport, Robert knocked on a basement window, and, according to the CI, Robert and the CI were admitted by Walter Jachimko through the front door, into what turned out to be Jachimko's home.

10. About twenty minutes later, the agent alert button was activated. Agents knocked on the side door, Jachimko opened the door, and then tried to close it when the agents

---

1. Defendant Robert Anhalt entered a plea of    guilty on February 18, 1993.

announced themselves as police. A scuffle ensued, and Jachimko was arrested. Robert was arrested on the front lawn, after exiting the residence through the front door. Marijuana plants were seized after a search of the apartment.

Several feature of the investigation that culminated in the challenged search are worthy of comment.

11. At no time during the investigation of the Anhalt brothers, from March to June of 1992, did the DEA contact the United States Attorney's office regarding the preparation of search or arrest warrants for any of the targets of the investigation. No warrants were sought as to Jachimko, of course, since the DEA was unaware of his existence until the arrest took place on June 30, 1992.

12. Although the CI was equipped with a recording device on June 30, 1992, the tapes of the conversations he had with Robert Anhalt and Jachimko are inexplicably blank. According to Agent Courtney, another DEA agent monitored the conversation of the CI and Robert as they drove to 4900 West Newport. This agent did not prepare a report about those conversations at the time, and no record of those conversations exists. The tapes from the arrest itself, from the recording device worn by the CI, are also blank.

13. The transmission device worn by the CI was also not functioning when the CI entered Jachimko's apartment; according to Hendrickson, when he gave the verbal signal for the agents to enter ("Do you want me to pay you now?"), there was no response. The CI then activated the alert button.

Finally, there is the matter of the CI, Hendrickson, himself.

14. Not surprisingly, he had had prior encounters with drugs and law enforcement. The court reiterates that Hendrickson contacted the DEA and volunteered to provide information on Robert Anhalt. He was not recruited. More importantly, in terms of his

credibility, Hendrickson testified that he had not used cocaine or any other drug since 1987.[2] A United States Probation Department special report on Hendrickson indicates that a random urine screen submitted on June 29, 1992, the day before the events in question, showed a positive result for cocaine use.[3] Having observed Hendrickson on the witness stand, this court finds that Hendrickson was not only not a credible witness, but that he in all probability perjured himself before the court.

## DISCUSSION

This case presents an interesting variation on the "second entry" or "consent once removed" doctrine developed by the Seventh Circuit in a trio of cases: *United States v. Janik*, 723 F.2d 537 (7th Cir.1983); *United States v. Paul*, 808 F.2d 645 (7th Cir.1986); and *United States v. Diaz*, 814 F.2d 454 (7th Cir.), *cert. denied*, 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987). Although the circumstances surrounding Jachimko's arrest and the search of his home are similar to the situations in which a "second entry" is permissible under the Fourth Amendment, there are also important differences.

The defendant in *Janik* told a friend that he had purchased a submachine gun, and later invited the friend, who happened to be a Chicago police officer, to see the gun. In the meantime, the friend had contacted the Bureau of Alcohol, Tobacco and Firearms and a group of law enforcement officials gathered outside Janik's apartment when the friend went on the arranged viewing visit. *Janik*, 723 F.2d at 541. After seeing the gun, the friend unsuccessfully tried to contact the arrest team by radio from Janik's bathroom. He then stepped into the lobby to radio the team, which swept in, searched the apartment after Janik signed a consent form authorizing a search, and seized the submachine gun as well as a sawed off shotgun.

---

2. Hendrickson testified, "I don't like drugs, all right? That's why I work for the DEA. I'm sorry if I seem aggravated, but it took three years out of my life and I seen a lot of suffering.... [I worked with the DEA] For money and satisfaction.... to try to do my part to clean up society." (Tr. at 89–90).

3. By strange coincidence, Hendrickson was before the court for violation of probation on the same day as the suppression hearing.

*Id.* The legality of the search was upheld, the court noting that the friend, whom the defendant knew to be a police officer, was expressly invited and that "[t]he fact that [the friend] got help from other officers in removing the submachine gun can make no difference." *Id.* at 547–48.

*United States v. Paul,* 808 F.2d at 648, expanded *Janik* to cover consensual entries made by confidential informants, rather than law enforcement personnel. In *Paul,* a confidential informant named Moore arranged to buy a bale of marijuana from Paul for $44,-000. Three telephone conversations between Moore and Paul were taped by Illinois officers cooperating with federal drug agents. *Id.* at 646. In these conversations, the time and place of the purchase were established. Not wanting to entrust Moore with such a large sum of money, the agents equipped him with an alert button which he was to activate when he saw marijuana at Paul's home, where the purchase was to be consummated. *Id.* When Paul led Moore to the basement and Moore observed two bales of marijuana, he pressed the button; the waiting agents knocked, received no answer, and arrested Paul when they proceeded to the basement and saw the marijuana. *Id.* at 646–47. The Seventh Circuit found the search lawful, holding that when a confidential informant gains entry by consent and is shown contraband, the informant can summon other agents to assist in the arrest, consistent with the Fourth Amendment. *Id.* at 648.

In *Diaz,* the Seventh Circuit articulated three requirements for valid "second entry" by law enforcement agents after an original, consensual entry is gained by an undercover officer or informant: "we have applied this doctrine of 'consent once removed' only where the agent (or informant) entered at the express invitation of someone with authority to consent, at that point established the existence of probable cause to effectuate an arrest or search, and immediately summoned help from other officers." *Diaz,* 814 F.2d at 459. Diaz was arrested after an investigation by Illinois drug enforcement personnel. An undercover agent named Mueller was introduced to Diaz by an acquaintance, and after several telephone con-

versations, Diaz agreed to sell Mueller eight kilograms of cocaine for $344,000. *Id.* at 455–56. The place of the purchase was arranged at a meeting between Mueller, Diaz, and the acquaintance the evening before the deal. Mueller was to come to Diaz's hotel room to test a sample of the cocaine, and if it was satisfactory, Mueller would have one hour to bring the money to the hotel. *Id.* at 456. All went as arranged. Diaz admitted Mueller into his hotel room, Mueller took a sample, and left the room, ostensibly to get money. He knocked on Diaz's door a few minutes later, claiming to have forgotten his keys, the door was opened and the surveillance team swept in, arrested Diaz and seized the cocaine. *Id.* The court found that Diaz had effectively consented to the second entry of the surveillance team, by virtue of his consent to Mueller's entry. *Id.* at 459.

Despite the rules announced in the "second entry" cases, the general rule remains that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspects's home in order to make a routine felony arrest." *Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 1375, 63 L.Ed.2d 639 (1980). This court perceives a danger that the "second entry" exception may swallow the general preference for warrants if it is expanded beyond its articulated limits. A finding that the search was proper in this case would work such an expansion. At the suppression hearing, DEA agent Courtney opined that a search of any house on the 4900 block of Newport Avenue would have been proper, as long as it was preceded by the entry of the CI and the activation of the alert button. This is extreme. As the Seventh Circuit itself noted in *Diaz,* "The importance of enforcing the drug laws cannot be an excuse for the erosion of basic constitutional protections." *Diaz,* 814 F.2d at 459.

In *Paul* and *Diaz,* the individuals arrested were the specific targets of law enforcement investigations. Law enforcement officials either had direct undercover contact with the target (*Diaz*), or had tapes of confidential informant contact with the target (*Paul*). In both of those cases, law enforcement officials had specific information about the illegal ac-

tivity that was afoot. In contrast, the agents in this case had direct contact, and taped contact through the CI, only with Robert Anhalt. Walter Jachimko had never been a target of their investigation. No evidence remains of any possible information they may have received about Jachimko before they entered his home, the tapes from that evening being blank.

While *Paul* and *Diaz* do not address the import of the ongoing investigations targeting the individuals actually arrested, those investigations provided law enforcement officials with a background of probable cause that the individuals targeted were committing violations of federal law. In fact, given this background, the Seventh Circuit noted in *Paul* that the law enforcement officials had sufficient information to get a warrant. Their admonition was stronger in *Diaz*, where the court stated, "we are at a loss to understand why the police did not obtain at least a search warrant in this case." *Diaz*, 814 F.2d at 457.

Without the background on the targeted individual provided by the ongoing investigation, the role of the confidential informant in determining the existence of probable cause is inflated, as it was in this case. When the anticipated sale at Anhalt's residence did not occur, and Hendrickson found himself in Jachimko's home, he could have concluded the meeting and reported to the DEA that he had met a new participant in the marijuana ring, together with what he had observed in the apartment. Instead, he chose to summon the agents. In this case, the informant led and the DEA followed. The person occupying this expanded role of informant, Hendrickson, has been found by this court to be insincere and incredible.

It is not for this court to expand the holdings of *Paul* and *Diaz* to cover warrantless searches of suspects not under investigation without clearer direction from the Seventh Circuit.[4] It may be, as *Paul* and *Diaz* intimate, that every invitation to a stranger

into one's home constitutes a waiver of one's privacy interest; this court is not prepared to make that ruling at this time. Instead, this court holds that the "second entry" doctrine does not extend to validate the search of Jachimko's home on June 30, 1992, where he had not been the subject of a law enforcement investigation prior to that time, and where the role of the confidential informant in determining probable cause was expanded due to the lack of investigative information linking Jachimko to any illegal activity.

### CONCLUSION

For the foregoing reasons, defendant Walter Jachimko's motion to suppress the fruits of the search of his home at 4900 West Newport in Chicago on June 30, 1992 is granted.

---

4. At the close of the suppression hearing, the court requested short briefs from counsel on the question of when a district court may question the constitutional validity of a decision of a superior court. Upon careful review of *Paul* and *Diaz*, this court determined that those decisions

were factually distinguishable from the current case, rendering the issue ordered briefed moot. In any event, the brief submitted by Jachimko's counsel was non-responsive to the court's order, and was, therefore, stricken.