UNITED STATES of America, Plaintiff,

v.

Walter JACHIMKO, Defendant.

No. 92 CR 538.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 22, 1995.

Daniel George Martin, Federal Defender Program, George Joseph Murtaugh, Jr., Attorney at Law, Chicago, IL, for Walter Jachimko.

Patrick Sean Layng, United States Attorney's Office, Chicago, IL, for U.S.

MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

An important question of constitutional law comes before the Court for a second time.

That question is whether a confidential informant ("CI") of proven unreliability, after entering an apartment building, may alone authorize a warrantless search of one of the units inside the building. In this case, the question comes down to a credibility determination that the Court resolves emphatically against the government. Accordingly, the Court holds the warrantless search at bar to be illegal under the Fourth Amendment.

## I

Defendant Walter Jachimko ("Jachimko") filed a motion to suppress evidence obtained subsequent to a June 30, 1992 warrantless search of his home. An evidentiary hearing was held on the motion in December 1992. The Court's first ruling on the motion to dismiss underestimated the reach of this circuit's consent-once-removed doctrine. *See United States v. Jachimko,* 19 F.3d 296, 299 (7th Cir.1994) (vacating this Court's granting of a motion to suppress in *United States v. Anhalt,* 814 F.Supp. 750 (N.D.Ill.1993)). In the prior opinion, the Court attempted to distinguish the line of cases enunciating this doctrine on two grounds: that there had been no previous investigation of Jachimko prior to the search of his home and that, by this fact, the role of the CI, a perjurer and a convicted felon, was improperly inflated. *See id.* at 754; *cf. United States v. Janik,* 723 F.2d 537 (7th Cir.1983) (holding that express invitation to view contraband offered to police officer friend in social setting established consent to search by later-summoned government agents); *United States v. Paul,* 808 F.2d 645 (7th Cir.1986) (expanding *Janik* by holding that consensual entry by confidential informant also established consent to search by later-summoned government agents); *United States v. Diaz,* 814 F.2d 454, 459 (7th Cir.), *cert. denied,* 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987) (articulating the standards governing "consent-once-removed:" (1) agent or informant enters at the express invitation of someone with authority to consent, (2) agent or informant establishes probable cause to effect an arrest or search, and (3) agent or informant immediately summons help from other officers). Finding the government had not shown consent to enter or any other exception to the Fourth Amend-

ment's warrant requirement, this Court earlier held the search of Jachimko's home illegal. *See Anhalt,* 814 F.Supp. at 754; *see also Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 1375, 63 L.Ed.2d 639 (1980) (holding the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest"); *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (holding uncoerced consent to be a valid substitute for the warrant requirement because it makes a search reasonable).

On appeal, the Seventh Circuit held this Court's distinctions irrelevant. *See Jachimko,* 19 F.3d at 299. They returned the case for reconsideration of the Defense's motion to suppress in light of the framework announced in *Diaz.* Even under the consent-once-removed analysis set forth in *Diaz,* the government failed to meet its burden to justify the warrantless search of Jachimko's home. In view of the absence of competent corroborating evidence, this Court has strong doubts that the CI had established probable cause to search by the time he summoned DEA agents to enter Jachimko's home.

## II

The government was required to meet its burden of showing Hendrickson had established probable cause inside Jachimko's apartment prior to sounding the alarm by a preponderance of the evidence. Only in this way would consent granted to Hendrickson extend to the later-entering officers under the *Diaz* framework. In this case, the probable cause issue is not separated from the Court by a layer of review. *See, e.g., Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (allowing after-the-fact voiding of an otherwise proper search warrant by impeachment of the affidavit presented before the neutral magistrate; deferential review); *cf. United States v. Nobles,* 69 F.3d 172, 179 (7th Cir.1995) ("The denial of a motion to suppress evidence is reviewed deferentially.... When the district court's decision rests on credibility determinations, ... 'the trial judge's ... choice of whom to believe is conclusive on the appellate court un-

less the judge credits exceedingly improbable testimony.'"). Since the government defaulted in obtaining a warrant, the question of probable cause stands naked before the Court.

The Court's findings of fact are set out in the prior opinion. To summarize, in March of 1992, on his own initiative, Joseph Hendrickson telephoned the Drug Enforcement Administration (DEA) to offer his services for investigating an alleged indoor marijuana growing operation managed by Robert and William Anhalt. To say Hendrickson is not a model citizen is to abuse understatement. He is a convicted felon, a former escapee from a federal prison, a drug user, and a violator of probation. In this Court's belief, Hendrickson is a liar and a perjurer as well. Before this Court, he affirmatively disclaimed having used drugs since 1987, when in fact, he tested positive for cocaine use the day before his crucial participation in a 1992 DEA buy-bust. Whether in spite of these facts or in ignorance of them (plus the fact of an outstanding arrest warrant), the DEA accepted his offer. He became a CI for monetary compensation.

For about two and a half months, Hendrickson and DEA agents Jodwalis and Courtney worked together to set up a purchase of marijuana plants from Robert and William Anhalt. Based on Hendrickson's tips and corroborating facts, the DEA suspected the Anhalts of operating a large scale marijuana growing operation. During several June 1992 meetings between Hendrickson and Robert Anhalt designed to lay the groundwork for a buy-bust, Hendrickson, unaccompanied by any DEA agent, was equipped with a transmitter which allowed the recording of his conversations. Those recordings were made without any particular mishap. Hendrickson and Robert Anhalt made preparations for the purchase of 150 marijuana plants from the Anhalts to occur on June 30, 1992.

Again unaccompanied by DEA agents (although under physical and electronic surveillance), Hendrickson met with Robert Anhalt on June 30, 1992. This time, he had in his possession an "agent alert button" with which he might summon the surveilling DEA agents. He was instructed not to press the alert button until he saw more than one hundred marijuana plants. Hendrickson went to Robert Anhalt's residence. He stayed for ten minutes, returned to a designated meeting place alone where DEA agents were gathered, and then went back to Robert Anhalt's apartment. From there, Robert Anhalt and Hendrickson left in a car and they drove to 4900 West Newport in Chicago, a location which had never been under DEA surveillance during the investigation. At the time they approached 4900 West Newport, the surveilling DEA agents had no idea who lived there or how many units there were in the building. They did not know of any violations of law taking place at that address.

All the information in the record of what happened next comes either from Hendrickson's testimony or from Agent Courtney's brief testimony of what surveilling agents told him. Even though Hendrickson was equipped with a transmitting device, the tapes of the conversations at this point are blank. According to the testimony of Agent Courtney, another DEA agent monitored the conversations of Hendrickson, but this agent did not prepare a report of those conversations, and no record of them exists. It cannot be stated too strongly: there is no corroborating evidence of what happened when Hendrickson, a liar and probably an addict, was indoors unobserved by government agents.

A.

Two excerpts from the direct testimony of the only witnesses the government produced illustrates the weight, or rather the lack of weight, of the government's key evidence. First, from Agent Courtney:

Q. And what happened then?

A. An Agent indicated that there was a knock on the window and they were subsequently let inside the residence.

Q. And they went inside the front door, is that right?

A. That's correct, that's what the Agent reported.

Q. The front door of—I'm pointing to Government Exhibit 2. Then what happened?

A. About 20 minutes later there was the Agent Alert signal sounded.

Q. About 20 minutes later?

A. Yes.

(Tr. at 32–33).

■ As this excerpt amply illustrates, the value of this essential testimony is undermined by hearsay, by responses to leading questions, and by the absence of proper foundation. This is in spite of repeated admonitions from the Court to counsel to take more care in conducting the direct examination. It is true that under Federal Rule of Evidence 104, hearings on a motion to suppress do not require the rigid use of the Federal Rules of Evidence and all of its exclusionary apparatus. However, this does not mandate the trial judge's uncritical acceptance of evidence adduced in violation of those rules. It is recognized in this context that a "trial judge's experience and legal training can be relied upon to winnow the chaff from the wheat." 1 Weinstein's Evidence ¶ 104[2] (1994). Although through no fault of the witness himself, the Court finds this testimony too overburdened by chaff to lend very much weight to whatever kernel lies within. The record fails to disclose who saw Hendrickson and Anhalt enter Jachimko's home, how Agent Courtney might have observed them enter, who was counting the passage of time, what was the instrument used to measure the passage of time, who received the alert signal, how Agent Courtney knew of the alert signal, and how much time elapsed between receipt of the signal and the entry into Jachimko's home.

The intended courtesy which some trial judges in this district may show in tolerating such less than skillful examination practice should not be misunderstood as acquiescence in the practice. It should be understood that such a technique ineluctably impairs the declarative presentation as well as the credibility of the testimony. It not only diminishes the certainty of the memory, the spontaneity, and the knowledge of the witness, but the words are not taken out of his mouth. To some degree, this is a result of habits which are formed during practice before the grand jury and which might be acceptable there, albeit unimpressive, but are not competent in a trial or a hearing on the merits of the charge.

### B.

This is the relevant direct testimony of CI Hendrickson, the only witness who said anything at all about the events inside Jachimko's home.

Q. Where did you go?

A. We went to Wally's [Defendant Jachimko's] house.

Q. Where is that?

A. On Newport.

Q. Who were you with?

A. I was with Bob [Robert] Anhalt.

     \*     \*     \*     \*     \*     \*

Q. Would you tell us what happened when you got there?

     \*     \*     \*     \*     \*     \*

A. We went to that—and if you look in that picture you will see there is some glass block windows facing the house to the left bottom and he knocked on it and—

Q. Who is "he"?

A. Bob Anhalt

Q. And then what happened?

A. And then Wally answered and came up and let us in the house.

Q. What happened when he let you in the house? Describe that a little bit more.

A. He came and opened the door and said "Come on in" and then let us down into the basement.

Q. And what happened after he let you down into the basement?

A. They showed me the grow.

Q. When you say "the grow," what do you mean?

A. Grow rooms. They're rooms with large and small marijuana plants and lights and fans and insulation, reflective stuff on the wall.

Q. Who showed you these things?

A. Wally and Bob.

Q. Wally, you mean the defendant?

A. Yes.

       \*    \*    \*    \*    \*    \*

Q. Mr. Hendrickson, after you were shown this marijuana, what happened next?

A. I was then shown by Wally and Bob the process to clone, which is growing small plants from the larger plants with chemicals and these little square blocks of insulation, little trays and what have you, how to do the lights and all that stuff.

Q. And where was that done?

A. It was done throughout the basement apartment, kitchen.

Q. And then what happened after you were shown this?

A. I gave the verbal signal after I counted the plants numerous times and then I activated the Agent Alert.

Q. You first gave the verbal signal, what do you mean?

A. We had worked out a prearranged signal for "Do you want me to pay you now?"

Q. That was the verbal signal?

A. Yes.

Q. And you gave that?

A. Yes.

Q. And what happened?

A. Nothing.

Q. I'm sorry?

A. Nothing.

Q. And then what happened?

A. So I hit the Agent Alert.

Q. And then what happened?

A. Then they came in and we were arrested.

(Tr. at 77–79, 82–83).

There are several reasons this Court gives no weight to anything Hendrickson stated on the stand while under oath. As stated in the first opinion, Hendrickson was not recruited: he contacted the DEA and volunteered to provide information on Robert Anhalt. Hendrickson testified he had not used cocaine or any other drug since 1987.

Q. Did you begin using cocaine at the end of '88?

A. No, sir, I haven't used cocaine since '86,-'87 or any other drug. I don't like drugs, all right? That's why I work for the DEA. I'm sorry if I seem aggravated, but it took three years out of my life and I seen a lot of suffering.

Q. Is it your testimony that you no longer use drugs?

A. Yes it is.

(Tr. at 89). He further testified that he worked for the DEA "[f]or money and satisfaction.... to try to do my part to clean up society." (Tr. at 90). In fact, a United States Probation Department special report on Hendrickson indicates that a random urine screen submitted on June 29, 1992, the day before the events in question, showed a positive result for cocaine use. In compensation, Hendrickson testified he received from the DEA $1,000 on July 1, 1992, one day after the events in question and two days after testing positive for cocaine use. (Tr. at 91). He also testified to receiving from the DEA $300 on July 15, 1992 and $500 in August 1992. (Id.). The Court observed Hendrickson on the witness stand, including his hostility during cross examination and his tendency to fidget. Again, lest it be still unclear, this Court finds that Hendrickson was not only not a credible witness, but that he perjured himself before the Court.

### C.

The following additional findings of fact did not appear in the Court's earlier opinion.

1. Under direct examination, Hendrickson admitted to convictions of conspiracy to distribute cocaine and of escape. Under cross examination, he admitted to additional convictions of theft and deceptive practices, as well as of criminal trespass, reduced from two counts of burglary.

2. The government, i.e., the DEA and the U.S. Attorney's Office in the Northern District of Illinois, either knew of these prior convictions or were on notice of them.

3. An arrest warrant for Hendrickson was pending since *before* Hendrickson contacted the DEA in March 1992. Hendrickson was not arrested under the warrant until the day of the hearing on the motion to suppress in December 1992. The night before the hearing, during the pendency of the outstanding warrant, the U.S. Attorney's office lodged Hendrickson in a downtown Chicago luxury hotel. The Court takes judicial notice that any law enforcement officer, such as one conducting a routine traffic stop, might have learned of this outstanding warrant in a matter of minutes. No explanation exists in the record why this warrant was not exercised for over a year, including during time when Hendrickson worked closely with and was paid by federal law enforcement agents.

4. Hendrickson admitted to the use in June 1992 of cocaine during a hearing on his probation violation. This probation hearing was prosecuted by the same U.S. Attorney's office, occurred on the same day, and occurred before the same judge, as the hearing on Jachimko's motion to suppress. After eliciting Hendrickson's testimony that he had not used drugs since 1987, the Assistant U.S. Attorney prosecuting Jachimko did not comment on the falsity of that representation, despite the obvious inconsistency with the day's earlier admission and the positive random urine screen.

5. The alleged tape recordings made during Hendrickson's time inside Jachimko's apartment, missing for unexplained reasons, either do not support the prosecution's testimony or do not exist.

6. The record does not disclose whether the alleged recording device was on the person of CI Hendrickson and thus under his control, or was in a DEA vehicle away from the scene of his activity.

7. CI Hendrickson did not recall which agent of the DEA instructed him on when to activate the agent alert button. Agent Courtney also provided no such information.

8. CI Hendrickson was at the time of the events in question a knowledgeable user of illegal drugs.

9. Based on its experience in criminal law and as a judge presiding over criminal trials, the Court finds that one of the common motives of knowledgeable users of illegal drugs for assisting drug enforcement officers is that they can continue to use narcotics under the auspices and with the acquiescence of law enforcement authorities.

10. Inconsistencies and gaps in Hendrickson's testimony of the events that occurred after the DEA agents entered Jachimko's home further undermines his credibility. On cross examination, when asked if Jachimko had permitted the DEA to enter, he said, "I don't know," and that he could see "but not clear enough to answer your question." He then explained that he was around the corner, and when asked what he could see, he answered, "Well, more or less I was trying to keep surveillance on Bob." He said that Jachimko was trying to keep his dog from running out, but he "didn't know whether he couldn't hold the dog or it wasn't listening or what." He first said he saw agents with their guns drawn always, and that there were about eight of them in flak jackets. But then he said he could not remember where the guns were pointed or how many agents came in because he was watching Robert Anhalt run upstairs out the front door. Agent Courtney gave no testimony about any dog, although the CI testified it was "running around trying to bite."

## III

■ Now, having set forth the factual background for the legal analysis, the Court addresses the consent-once-removed framework announced in *United States v. Diaz,* 814 F.2d 454, 459 (7th Cir.1987). *See also United States v. Akinsanya,* 53 F.3d 852, 856 (7th Cir.1995) (applying same). Under that framework, the warrantless entry into a home by law enforcement personnel summoned in by an agent or informant is valid where (1) an agent or informant was expressly invited inside, (2) the agent or informant at that point established probable cause to arrest or search, and (3) the agent or informant immediately summoned help from other officers. *Id.*

The legal fiction enabled under this framework is that the warrantless entry by the police after being summoned (the "second

entry") is made reasonable under the Fourth Amendment because of the earlier consent granted to an agent of the government. It does not matter that the agent deceives the host as to his identity or affiliation with the police. *See Lewis v. United States,* 385 U.S. 206, 209, 87 S.Ct. 424, 426, 17 L.Ed.2d 312 (1966); *Hoffa v. United States,* 385 U.S. 293, 303, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966). It does not matter that the agent might be a confidential informant, possessing his own motives, pecuniary or otherwise, for effecting an arrest. *See Paul,* 808 F.2d at 648; *but cf. Hoffa,* 385 U.S. at 317, 87 S.Ct. at 421 (Warren, C.J., dissenting) ("Here, . . . a jailbird languishing in a Louisiana jail under indictments for . . . embezzlement, kidnapping, and manslaughter (and soon to be charged with perjury and assault), contacted federal authorities and told them he was willing to become, and would be useful as, an informer. . . . A motive for his doing this is immediately apparent—namely, his strong desire to work his way out of jail. . . ."). It does not matter that the agent is perfectly able to exit the home without summoning the second entry so that a warrant may be obtained from a neutral magistrate. *See Janik,* 723 F.2d at 547–48. This is the law of this circuit, and this Court must follow it. *But see California v. Carney,* 471 U.S. 386, 392–93, 105 S.Ct. 2066, 2070, 85 L.Ed.2d 406 (1985) (expanding the "automobile exception" to motor homes on facts similar to those found in *Diaz;* no mention of consent extending to government officers even though "second entry" by accompanying citizen would likely have been held consensual). Nonetheless, the following words by Justice Jackson still ring powerful.

Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

■ In applying *Diaz,* this Court believes it has a duty to see that law enforcement officers do not reduce the protections of the Fourth Amendment to, in Justice Jackson's words, "a nullity." Although it is at best questionable whether the government sustained its burden to show any of the three *Diaz* elements, the government certainly did not establish probable cause. In the context of a search, "probable cause" means a substantial probability that certain items are the fruits, instrumentalities or evidence of crime and that these items are presently to be found at a certain place. *See generally Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (Rehnquist, J.). Law enforcement officers, and by extension neutral magistrates reviewing applications for search warrants, frequently must rely on the reports of unknown, undisclosed, or untrustworthy informants to decide whether probable cause exists in a particular case. The role of the magistrate reviewing such information is to determine whether, by the totality of the circumstances, probable cause exists.

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.,* 462 U.S. at 238, 103 S.Ct. at 2332. Probable cause is a "fluid concept," *id.,* 462 U.S. at 232, 103 S.Ct. at 2329, and an "informant's veracity, reliability and basis of knowledge are all highly relevant in determining the value of his report." *Id.,* 462 U.S. at 230, 103 S.Ct. at 2328 (internal quotations omitted).

The Supreme Court has been careful to recognize the need for corroboration to rehabilitate potentially unreliable tips provided by unsavory informants. Accordingly, the presence of facts corroborating an informant's tip provides the indispensable assurance that there is no "evisceration of the probable cause standard." *Id.,* 462 U.S. at 272, 103 S.Ct. at 2350 (White, J., concurring).

Under the totality of the circumstances test, reliable corroboration functions to sanitize information concerning criminal activity entering the hands of police via unknown or tainted origin. *See id.*, 462 U.S. at 241–43, 103 S.Ct. at 2334–35 (trumpeting the value of "corroboration of details of an informant's tip by independent police work" and approving of the result in *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), in which the arresting officer "had personally verified every facet of the information given him by" the informant).

■ Discounting to zero the testimony of Hendrickson, the government presented no evidence informing the Court of what happened inside Walter Jachimko's home on the evening of June 30, 1992. Recall that the tape was blank. The Court may make a negative inference concerning the absence of any transcript. The Court does so and finds that the empty tape further undermines the government's case that there existed probable cause in the moments before Hendrickson pressed the alert button.

At this point the Court's task, after putting the discounted testimony aside, is to determine whether the remaining information of record supports a finding of probable cause. *See U.S. v. Jimenez*, 824 F.Supp. 351, 362 (S.D.N.Y.1993), *rev'd on other grounds*, 68 F.3d 49 (2d Cir.1995). At best, the testimony of Agent Courtney suggests that (1) Hendrickson was in the midst of a transaction for the purchase of marijuana plants, (2) Hendrickson visited the home of Robert Anhalt twice in the course of a few hours, (3) Hendrickson and Robert Anhalt drove to an apartment, (4) one of the two knocked on a window, (5) they then entered through the front door, and (6) twenty minutes later an alert signal was received. All this, by itself, does not establish that Hendrickson had probable cause to believe contraband was located inside Jachimko's home. At worst Agent Courtney's testimony, both as direct evidence and as corroboration of Hendrickson's tale, is irretrievably defective because it is based on hearsay, it lacks foundation, and it is in response to incessant leading questions on direct. In the Court's opinion, this "corroboration" would do little or nothing to

back up even an honest person's testimony about what occurred inside Jachimko's apartment.

Hendrickson's instructions were to press the alert button upon seeing one hundred or more marijuana plants. Why did it take twenty minutes to verify the presence of one hundred plants? Did it really take twenty minutes? Or five? Or sixty? Would Hendrickson have pressed the alert button prematurely, before seeing any contraband? Would the hope of a large reward augment an active appetite for cocaine and lead him to disobey the DEA's instructions? Can someone who lies under oath in front of a federal district judge be trusted to remember and recount accurately what he saw and when? And what about the scope of any consent Jachimko might have granted to Hendrickson? *See Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991) (search cannot exceed scope of consent); *Paul*, 808 F.2d at 648 (informant may establish consent for second entry as long as he does not exceed the scope of his invitation). Would Hendrickson obey a host's request not to look behind a closed door, not to open a sealed container, or not to wander aimlessly through a host's private rooms? The lack of answers to these questions, combined with the mysteriously blank tape and the unhelpfulness of Agent Courtney's testimony for corroborating CI Hendrickson's, compels the conclusion that the government failed to sustain its burden at the suppression hearing. The government did not sufficiently show, with reliable evidence, that Hendrickson had probable cause to believe that contraband was located in Jachimko's basement apartment prior to pressing the alert button.

Other district courts have excoriated the government for using perjured testimony to slip into evidence the fruits of an illegal search. *E.g. U.S. v. Sanchez*, 813 F.Supp. 241 (S.D.N.Y.1993), *aff'd on other grounds*, 35 F.3d 673 (2d Cir.1994). This Court agrees with the words of one of those district courts that there can be "few things more threatening to the liberty of our citizens than to have a court system which tolerates perjury by

Government agents in a criminal trial." *Id.* at 242.

Fortunately, our Constitution places [the weighing of society's best interests] in the courts and not the police. Law enforcement officers must learn to accept that fact and should never be permitted to think that the courts will allow them to avoid full compliance with the mandates of the Constitution by the simple expedient of lying about their actions.

*Id.* at 251. This Court will not tolerate lying under oath, or even the probability of a lie made under oath, to serve as an expedient for the conviction of a criminal defendant. *Accord California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984).

As a final note, the government did nothing to help its case against Jachimko when it displayed nonchalance, to use a merciful word, at the perjury occurring in this courtroom under its auspices. The government had a duty, as it must in a free society, to point out the lies of its own witness and to disavow them. *Id.* (mistrial when government withholds from the defense knowledge of the perjury of its own witness). On the contrary, the government granted this witness luxury accommodations and an extended amnesty from arrest under an outstanding warrant. The question of prosecutorial misconduct is not presently before the Court. Nonetheless, such behavior on the part of government officers who have sworn an oath to uphold the Constitution is nothing short of scandalous.

## CONCLUSION

The Fourth Amendment states,

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const.Amd. IV. It applies in this case to require suppression of the evidence seized from Walter Jachimko's apartment by the DEA on June 30, 1992. The motion to suppress is granted.