RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0287p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JAMES O'NEILL and ANGELA O'NEILL,
                    *Plaintiffs-Appellants,*


           *v.*

                                                    No. 10-5699


LOUISVILLE/JEFFERSON COUNTY METRO
GOVERNMENT; LOUISVILLE METRO ANIMAL
SERVICES; GILLES MELOCHE, in his
individual and official capacities; WAYNE
ZELINSKY, in his individual and official
capacities; TERRY PENDLETON, in her
individual and official capacities; and
UNKNOWN DEFENDANTS, John and/or Jane
Does, in his/her/their individual capacities,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 09-00871—John G. Heyburn II, District Judge.

Argued: October 14, 2011

Decided and Filed: November 8, 2011

Before: GILMAN and KETHLEDGE, Circuit Judges; LUDINGTON, District
Judge.[*]

_____

## COUNSEL

**ARGUED:** Michael C. Merrick, DINSMORE & SHOHL LLP, Louisville, Kentucky,
for Appellants. Lisa A. Schweickart, JEFFERSON COUNTY ATTORNEY'S OFFICE,
Louisville, Kentucky, for Appellees. **ON BRIEF:** Michael C. Merrick, Jon L.
Fleischaker, R. Kenyon Meyer, DINSMORE & SHOHL LLP, Louisville, Kentucky, for
Appellants. William T. Warner, JEFFERSON COUNTY ATTORNEY'S OFFICE,
Louisville, Kentucky, for Appellees.

_____

[*]The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of
Michigan, sitting by designation.

**OPINION**

RONALD LEE GILMAN, Circuit Judge.  This is perhaps the dog-gonest case ever to reach a federal appellate court.  In October 2008, several uniformed officers of the Louisville Metro Animal Services (LMAS) intruded into the O'Neills' home without a warrant and without consent, confiscated the O'Neills' two adult dogs and the dogs' litter of seven puppies, neutered and spayed the adult dogs and implanted microchips in all nine animals, and then required the O'Neills to pay over $1,000 to retrieve them, all without any formal charges ever being lodged against the O'Neills.

The district court dismissed all of the O'Neills' constitutional and state-law claims arising out of this incident, concluding that the O'Neills were operating an unlicensed Class A kennel in violation of the City's animal-control ordinance, and that none of their constitutional or state-law claims had merit.  For the reasons set forth below, we reinstate the majority of the O'Neills' claims and remand the case for further proceedings consistent with this opinion.

**I.  BACKGROUND**

**A.     Factual background**

The facts set forth below are based solely on the allegations in the O'Neills' complaint because the case never proceeded beyond the pleadings stage.  These facts reveal that the O'Neills, after breeding their adult American bulldogs to each other for the first and only time, welcomed eleven puppies into their home on September 4, 2008. The O'Neills advertised these puppies for sale in the *Louisville Courier-Journal*.  By October 30, 2008, they had sold four of the puppies and were scheduled to meet a pair of potential buyers that day who, unbeknownst to the O'Neills, were two female undercover LMAS officers.

When the undercover officers arrived, the O'Neills invited the officers into their home and allowed them to look at the puppies.  The women then stepped outside after

telling the O'Neills that they were going to discuss whether they wanted to purchase a puppy. A moment later, upon hearing a knock, James O'Neill opened the door to find several uniformed LMAS officers on his front step accompanying the purported buyers. The LMAS officers demanded to see the O'Neills' "breeder's license." James informed them that he did not have a breeder's license, nor did he think that one was required. The LMAS officers told him that they could confiscate all the dogs because the O'Neills did not have a breeder's license and, further, that if more than one dog were unlicensed, then LMAS could seize all the animals on the premises. Neither of the O'Neills' adult dogs were in fact licensed. Without a warrant or the consent of the O'Neills (in fact, over their specific objection), the LMAS officers immediately entered the O'Neills' home and took all the dogs to the LMAS facility.

The next morning, the O'Neills went to the LMAS facility to retrieve their two adult dogs and seven remaining puppies. LMAS staff informed the O'Neills that before the nine dogs could go home, the adult dogs had to be altered (i.e., spayed or neutered), all nine had to have identification microchips inserted under their skin, and the O'Neills had to purchase a breeder's license. The O'Neills objected, arguing that the adult dogs should not be altered because they had been unlawfully impounded. LMAS Director Gilles Meloche asserted in response that he had "created" the animal-control ordinance in the Louisville/Jefferson County Metro Government Code of Ordinances, and the ordinance gave him the right to impound the dogs and alter them prior to release. Meloche then proposed a deal. Instead of fining the O'Neills up to $3,000 and/or arresting them, Meloche told the O'Neills that if they paid $1,020.95 on the spot, then they could take their animals home.

The O'Neills paid the $1,020.95 for the immediate release of their dogs. But they were never provided with written notice of any alleged violations of the animal-control ordinance in connection with the impoundment. All nine dogs were released to the O'Neills after receiving microchips and unnecessary vaccinations, and the two adult dogs were altered. Moreover, during their short stay at the LMAS facility, the dogs contracted various infections that required expensive veterinary treatment. Following

the return of the dogs, the O'Neills sold the remaining seven puppies for less than their normal market value.

**B.      Procedural background**

The O'Neills' initial complaint, brought under 42 U.S.C. § 1983, alleged that their Fourth Amendment rights were violated by the warrantless search of their home and the seizure of their nine dogs (Count I), and that their right to procedural due process was violated by the failure of LMAS to provide meaningful notice of, or an opportunity to be heard on, the charges against them (Count II).  They later moved to amend their complaint to add § 1983 claims for a substantive due process violation (Count III) and an equal protection violation (Count IV), as well as supplemental state-law tort claims for trespass (Count V), conversion (Count VI), and outrage (Count VII).  The district court granted the motion to amend in part, allowing the new § 1983 claims but holding in abeyance its ruling on the state-law claims.

Pursuant to Rules 12(b)(1), 12(b)(6), and 12(c) of the Federal Rules of Civil Procedure, the defendants moved to dismiss all the claims against them.  They also sought to remove LMAS as a party on the basis that it was not an entity that could be separately sued.  Although the O'Neills agreed that the claims against LMAS should be dropped, they opposed any other change.  The district court nevertheless dismissed every claim, even the state-law claims that it had not yet permitted to be added to the complaint, holding that none of the O'Neills' claims were viable.  This timely appeal followed.

**II.  ANALYSIS**

**A.      Standard of review**

We review de novo the dismissal of a complaint under Rule 12 of the Federal Rules of Civil Procedure.  *Mixon v. State of Ohio*, 193 F.3d 389, 399-400 (6th Cir. 1999).  The district court's interpretation of a local ordinance is also subject to de novo review.  *Fifth Column, LLC v. Vill. of Valley View*, No. 98-3963, 2000 WL 799785, at

*5 (6th Cir. June 13, 2000) (unpublished opinion). We must "construe the complaint in the light most favorable to the [O'Neills]" and accept all the factual allegations contained therein as true. *See Mixon*, 193 F.3d at 400.

**B.      Class A kennel issue**

The threshold issue in this case is whether the O'Neills were in fact operating a "Class A kennel" during the brief period of time that they had the puppies for sale. As defined in the animal-control ordinance, a Class A kennel is "[a]ny establishment where dogs and/or puppies . . . are kept for the primary purpose of breeding, buying, or selling such animals and which establishment is so constructed that the dogs[ and/or] puppies . . . cannot stray therefrom." Louisville/Jefferson Cnty. Metro Gov't, Ky., Code of Ordinances (LMCO) § 91.001. Whether the O'Neills' home is a Class A kennel, therefore, initially turns on whether their home is appropriately considered an "establishment."

"To interpret a state or municipal ordinance, federal courts look to see whether state courts have spoken on the issue." *Gaughan v. City of Cleveland*, 212 F. App'x 405, 409 (6th Cir. 2007). Here, we have found no Kentucky court interpreting the term "Class A kennel" as defined in LMCO § 91.001. Where no state court has interpreted the term at issue, "federal courts will look to the words of the ordinance itself, the interpretations the state court has given to analogous statutes, and perhaps to some degree, the interpretation of the statute given by those charged with enforcing it" to determine the meaning of the ordinance. *Gaughan*, 212 F. App'x at 409-10 (brackets, ellipsis, and internal quotation marks omitted).

The district court determined that the O'Neills' home was an "establishment" primarily because the 1994 edition of Webster's II New Riverside University Dictionary defines the word loosely as "a business firm, club, institution, or residence." *Id.* at 444. We respectfully disagree with the court's conclusion.

To start with, the word "establishment" is defined in the more precise Black's Law Dictionary (9th ed. 2009) as "[a]n institution or place of business." This definition accords with common parlance, since a private residence is not typically referred to as an "establishment." Nor has any Kentucky court so applied the word.

Furthermore, words undefined in a statute or ordinance should be interpreted according to their common meaning and in reference to the context in which they appear. *See Lichtenstein v. Barbanel*, 322 S.W.3d 27, 35 (Ky. 2010) ("[Kentucky courts] will read the statute as a whole, and with other parts of the law of the Commonwealth, to ensure that [the] interpretation is logical in context."). The context here concerns the conditions applicable to those who operate Class A kennels. Section 91.023 of the ordinance requires that Class A kennels be subject to "periodic inspections of public areas . . . during such entity's business hours." LMCO § 91.023(C). Class A kennels must also contain indoor enclosures "constructed of an impervious material," with floors made of "metal, fiberglass, [or] concrete or covered throughout with a minimum of three inches of gravel" "for each animal housed." LMCO §§ 91.120(B), 91.123(B). These requirements make sense as applied to a full-time commercial kennel, but not to a private residence where two family pets are bred for a single litter of puppies.

In addition, the definition of a Class A kennel includes only such establishments "so constructed that dogs, puppies, cats and kittens cannot stray therefrom." LMCO § 91.001. The district court concluded without explanation that the O'Neills' home is such a place. But this reading makes the clause superfluous, an outcome that should be avoided when interpreting an ordinance. *See Spencer v. Estate of Spencer*, 313 S.W.3d 534, 544 (Ky. 2010) (rejecting an interpretation of a statute that would make some of its provisions "redundant and superfluous"). Specifically, there is no indication in the record that the O'Neills' home contained any special features to contain pets or prevent their escape. If their home is deemed to be "so constructed" as to prevent animals from straying therefrom, then virtually every structure in Louisville would satisfy this condition.

Also relevant is the definition of "commercial" versus "non-commercial" kennels in the Louisville land-use ordinances. The key language for a "commercial kennel" is materially the same as for a "Class A kennel" in the animal-control ordinance, both using the word "establishment." *Compare* Louisville/Jefferson Cnty. Metro Gov't, Ky., Land Dev. Code ch. 1, pt. 2 (defining a "commercial kennel" as "[a]ny lot, structure, premises, or establishment . . . where dogs and/ or puppies . . . are kept for the primary purpose of breeding, buying, [or] selling . . ."), *with* LMCO § 91.001 (as quoted above in the first paragraph of this Part B.).

The "non-commercial kennel" definition, on the other hand, refers to a "residence," and specifically states that selling up to three litters of puppies per year does not make the residence a "commercial kennel." Louisville/Jefferson Cnty. Metro Gov't, Ky., Land Dev. Code ch. 1, pt. 2. Given this distinction, we see no reason to interpret the definition of a Class A kennel as encompassing what the term "commercial kennel" does not—namely, a private residence where two family pets are bred for a single litter of puppies.

Another weakness in the defendants' attempt to apply the Class A kennel definition to a private residence is the requirement that the "primary purpose" for keeping the animals be for sale or breeding. Here, the O'Neills had two adult American bulldogs as long-term family pets that they bred on a one-time basis. No one can reasonably argue on the facts as alleged that the O'Neills' *primary purpose* for keeping the adult dogs was to breed them, and they certainly were not for sale. True enough, the litter of puppies was for sale, but the "are kept" language in the ordinance implies a long-term operation applicable to a commercial kennel, not to a private residence where a single litter of puppies are put up for sale over a period of a few weeks or less. The O'Neills correctly point out that if the district court's interpretation were accepted, then as soon as they sold all the puppies, their home would cease to be a Class A kennel despite the continuing presence of their two adult dogs. To have an establishment's "primary purpose" turn on such a circumstance strikes us as inconsistent with the wording of the ordinance as a whole.

We also find significant the fact that LMAS itself had never before applied the Class A kennel designation to a private residence. In a 2008 renewal-notice letter addressed to currently licensed Class A kennel and cattery operators, LMAS Lieutenant Ann Camp stated that "[t]he Class A Kennel/Cattery License is for *establishments whose primary purpose* is buying, breeding or selling dogs, ferrets, and/or cats." (Emphasis added.) This shows that, in the same year as the events in question, LMAS was focusing on the primary purpose *of the establishment* as the key factor in the ordinance's application. Reading the ordinance this way, it clearly excludes a private residence like the O'Neills'. This interpretation also contradicts the defendants' current argument that the ordinance applies to a range of establishments so long as the primary purpose for which the dogs or puppies "are kept" is buying, breeding, or selling. We find unpersuasive the defendants' attempt to disregard LMAS's prior inconsistent position.

In sum, the common meaning of the words "establishment," "so constructed," and "primary purpose," the context in which these words and the term "Class A kennel" are used in the Louisville Metro ordinances, and the inconsistent positions of LMAS all lead to the inexorable conclusion that the O'Neills were not in fact operating a Class A kennel. They thus had no obligation to obtain a breeder's license in order to sell their single litter of puppies.

## C.      Fourth Amendment claim

The district court also determined that there was no Fourth Amendment violation by the LMAS officers. It based its ruling on the consent of the O'Neills to the undercover agents' first entry into the O'Neills' home, and on the doctrine of consent-once-removed to justify the warrantless second entry by the uniformed officers. But the court's decision was premised on its earlier determination that the O'Neills were illegally operating a Class A kennel in their home. Without this foundation, the court's Fourth Amendment analysis becomes quite shaky. The court itself recognized the linkage, stating: "Plaintiffs assert that they were not operating a Class A kennel and,

therefore, were not required to obtain any license prior to selling their puppies. If Plaintiffs['] interpretation is correct, then their claims may be viable."

### 1.     *Initial entry by undercover LMAS officers*

The district court held that the first entry was constitutional because the O'Neills consented to the entry by inviting the two undercover LMAS officers into their home to inspect the puppies. Warrantless searches and seizures within a home are "per se unreasonable[,] subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (ellipsis and internal quotation marks omitted). One such exception occurs where the search or seizure is conducted with the consent of the home's lawful occupants. *Id.*

Although we agree that the first entry was constitutional, we do so on a different ground than the one articulated by the district court. The district court determined that the search was constitutional because the O'Neills consented to it. But we conclude, as did the Supreme Court in *Maryland v. Macon*, 472 U.S. 463 (1985), under analogous circumstances, that no Fourth Amendment search even occurred. In *Macon*, undercover officers entered a store to buy illegal magazines, and the Supreme Court ruled that the officers' entry was not a search under the Fourth Amendment because "entering the bookstore and examining the wares that were intentionally exposed to all who frequent the place of business did not infringe a legitimate expectation of privacy." *Id.* at 469. Similarly, the O'Neills opened a portion of their home to the public when they invited those who responded to their newspaper ad to come and look at the puppies. Importantly, the O'Neills do not allege that the undercover LMAS officers intruded into their home any more than permitted or any more than any other person who responded to the ad.

The O'Neills nevertheless argue that the undercover LMAS officers' use of a subterfuge to enter their home should be prohibited. But the O'Neills assumed the risk that some of those who visited their home might not have a genuine interest in purchasing the puppies. *See Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a

person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). On this issue, the O'Neills are simply barking up the wrong tree.

### 2.      *Second entry by uniformed LMAS officers*

We find more merit to the O'Neills' Fourth Amendment argument regarding the second entry. In concluding that the LMAS officers could constitutionally reenter the O'Neills' home without a warrant, the district court relied on the consent-once-removed doctrine. This doctrine allows government agents to

> enter a suspect's premises *to arrest* the suspect without a warrant if [undercover agents]: 1) entered at the express invitation of someone with authority to consent; 2) at that point established the existence of probable cause to effectuate an arrest or search; and 3) immediately summoned help from other officers.

*United States v. Yoon*, 398 F.3d 802, 806 (6th Cir. 2005) (emphasis added) (applying the doctrine to the sale of illegal drugs). The O'Neills argue that this doctrine does not apply in the present case, where the undercover officers left the premises and then attempted to make a second entry. This court has previously held that, under the consent-once-removed doctrine, an undercover agent or informant in a suspect's home may signal to agents outside to come in and effectuate an arrest. *Id.*; *United States v. Romero*, 452 F.3d 610, 618-19 (6th Cir. 2006). But this court has not extended the doctrine to cover reentry after the undercover agent or informant has left the premises, or where there is no intent to effectuate an arrest, and we decline to do so here.

The defendants urge us to follow the Seventh Circuit's line of cases extending the consent-once-removed doctrine to the warrantless entry of backup officers where the undercover agent or informant, who initially entered by consent, exited moments before the backup officers entered. *See United States v. Akinsanya*, 53 F.3d 852, 855-56 (7th Cir. 1995) (holding that DEA agents may enter moments after, or at the same time as, the informant exited because they were "immediately summoned" by the informant); *United States v. Diaz*, 814 F.2d 454, 459 (7th Cir. 1987) (holding that initial consent was

not withdrawn where the undercover officer "momentarily stepped out to obtain help from other officers [located in the room across the hall] in making the arrest").

*Akinsanya* and *Diaz*, however, do not stand for the general proposition that achieving "one consensual entry" permits "law enforcement agents [to] thereafter enter and exit a home at will." *Diaz*, 814 F.2d at 459. Both were drug cases in which the purpose of the undercover agent's or informant's exit was to immediately summon officers to help effectuate an arrest. *See Akinsanya*, 53 F.3d at 855-56; *Diaz*, 814 F.2d at 459. Those circumstances distinguish *Akinsanya* and *Diaz* from this case, where the backup LMAS officers did not—after the undercover officers exited—rush in to help effectuate an arrest. They instead knocked on the O'Neills' door to request proof of a "breeder's license," carried on a discussion with the O'Neills about the need for such a license, and entered only after the O'Neills specifically objected to their coming into the residence.

The LMAS officers in fact never intended to effectuate an arrest in this case. Yet the doctrine of consent-once-removed is "based upon the theory that, because an undercover agent or informant who establishes probable cause to arrest the suspect may in fact arrest him then and there, he should be entitled to call in the agents with whom he is working to assist in the arrest." *Yoon*, 398 F.3d at 809-10 (Kennedy, J., concurring). Only then may officers "seize anything in plain view and . . . conduct a protective sweep, but they may not conduct a general search without first satisfying the ordinary requirements of consent, a warrant, or exigent circumstances, which excuse the failure to obtain a warrant." *Id.* at 806 n.1 (internal quotation marks omitted).

Applying the consent-once-removed doctrine to the LMAS officers' second entry, where no arrest was intended, would go well beyond the confines of this limited doctrine, which has yet to be adopted by the Supreme Court. *See Pearson v. Callahan*, 555 U.S. 223, 243-44 (2009) (declining to rule on whether the consent-once-removed doctrine is constitutional by instead resolving the issue of qualified immunity on the basis that no clearly established law was violated). We therefore conclude that the

O'Neills have sufficiently pleaded a Fourth Amendment violation based on the second warrantless entry.

**D.      Procedural due process claim**

In their second § 1983 claim, the O'Neills allege that they were never "provided with proper notice of any alleged violation of law or of any legal process for challenging the seizure and alteration of their animals by LMAS." They argue that this lack of notice violated their Fourteenth Amendment right to procedural due process. The district court concluded that there was no procedural due process violation because the dogs were legally impounded and LMAS was entitled to alter the impounded, unlicensed dogs. To the contrary, we have concluded in Part II.B. above that the LMAS officers had no legitimate basis for impounding the dogs. We are also of the opinion that even if the impoundment had been legal, the O'Neills would still have properly alleged a violation of their right to procedural due process.

"In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009) (internal quotation marks omitted). The O'Neills assert that they have satisfied the first two elements of their procedural due process claim because they were deprived of their money and the ability to breed their dogs in the future (due to their pets having been altered during the impoundment) without the due process of law. The defendants do not dispute that the O'Neills have a protected property interest at stake or that they were deprived of that interest. "[T]here can be no dispute that an animal owner has a substantial interest in maintaining his rights in a seized animal. . . . Animal owners [ ] have a substantial interest in their 'mere' pets." *Siebert v. Severino*, 256 F.3d 648, 660 (7th Cir. 2001) (internal quotation marks omitted); *see also Louisville Kennel Club, Inc. v. Louisville/Jefferson Cnty. Metro Gov't*, No. 3:07-CV-230-S, 2009 WL 3210690, at *10 (W.D. Ky. Oct. 2, 2009) (unpublished

opinion) (interpreting other sections of the LMCO chapter on animals to hold that "pet owners clearly have a property interest in their animals" and that "the government is not permitted to deprive an animal owner of his property without due process of law").

The only element of the due process claim that remains at issue on appeal is whether, given the property interest at stake, the O'Neills were afforded the procedural process that they were due. They argue that, at a minimum, they were entitled to receive written notice of their purported violations of the LMCO animal-control ordinance. We agree.

"Due process requires notice of the charges and a meaningful opportunity to contest the evidence." *Morrison v. Warren*, 375 F.3d 468, 473 (6th Cir. 2004). "Notice, of course, is one of the most fundamental aspects of due process." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 638 (6th Cir. 2005). Yet the only notice that the O'Neills were given of the charges or evidence against them was the brief conversation that they had with LMAS Director Gilles Meloche. At that time Meloche offered his proposed deal, but he never informed the O'Neills of the sections of the ordinance that they had allegedly violated.

The defendants now assert that the puppies were impounded pursuant to LMCO § 91.027(E) and the adult dogs pursuant to LMCO § 91.070(D). LMCO § 91.027(E) provides that, "[i]n addition to a citation issued to the owner, any animal sold or offered for sale in violation of this section may be impounded by [L]MAS." *Id.* This language necessarily implies that a citation is required to impound the puppies, but none was in fact issued.

As for the adult dogs, LMCO § 91.070(D) provides that "[a]ny animal deliberately used to facilitate an act that is illegal under federal, state, or metro law shall be impounded," but is silent as to any citation requirements. *Id.* The section on the issuance of citations and violation notices, however, provides as follows:

> In addition to, or in lieu of impounding an animal for any violation of this chapter, any Animal Control Officer . . . may issue a citation to the owner

of such animal specifying the section or sections of this chapter so violated and identifying the specific nature of the violation. Such citation shall impose upon the owner the obligation of appearance to answer the charges specified in the citation . . . at the time and place indicated on the citation.

LMCO § 91.073(A). If an officer decides to issue a violation notice in lieu of a citation, that notice must "stipulate a compliance date and associated fee and late fee, as well as a waiver provision providing that the person to whom the violation notice is issued waives all rights to protest such violation and waives all rights to a hearing on the issues relating to that violation." LMCO § 91.073(B). LMCO § 91.074(D) further provides that a violation notice must

(1)    Be in writing;
(2)    Include a statement of the violation or violations and why the notice is being issued;
(3)    Inform the offender of the right to appeal;
(4)    Include a statement that a determination of violation shall be final unless appealed in accordance with this chapter; and
(5)    Include a statement of penalties provided for the violation(s).

*Id.*

Meloche's confrontation with the O'Neills lacked all the elements required by LMCO §§ 91.073(A)-(B) and 91.074(D)—sections of an ordinance that Meloche claims he created—and was not reasonably calculated to apprise the O'Neills of the allegations against them or of the procedures available to present their objections. *See United States v. Baker*, 807 F.2d 1315, 1323-24 (6th Cir. 1986) (holding that notice was not constitutionally adequate where the clear-cut statutory procedures for notification were not followed); *cf. Herrada v. City of Detroit*, 275 F.3d 553, 557 (6th Cir. 2001) (holding that a parking citation provided adequate notice where it was "reasonably calculated to inform the vehicle owners of the allegations against them and the procedures available to obtain a hearing to contest the allegations").

Furthermore, the circumstances as here alleged have an under-the-table, improper air about them. No one is accusing Meloche of personally pocketing the money for his

own gain, but his confrontation with the O'Neills has the feel of a pseudo-shakedown that is not at all akin to a plea agreement, as the defendants would have us believe. If it were a plea agreement, what charges were the O'Neills pleading guilty to? At least as alleged, no notification was provided to the O'Neills and no record of this transaction, or of the alleged violations, was made with any court.

Meloche also threatened the O'Neills with the possibility of arrest if they did not accept his "deal." This threat suggests that the O'Neills were facing not only civil offenses, but criminal charges as well. But the procedural due process required in the context of a criminal proceeding is "considerably greater" than in a civil proceeding. *Herrada*, 275 F.3d at 559. "[A] guilty plea [to a crime] occurs after a formal charge has been issued, whereas a citation is only the allegation of a civil infraction," *id.* at 559-60, and "is involuntary where the defendant lacks knowledge of an element of the offense required for conviction and therefore does not understand the nature of the charge against him . . . ," *United States v. Layne*, 192 F.3d 556, 577 (6th Cir. 1999). Clearly, the O'Neills were not made aware of the charges and/or violations that they were purportedly subject to, much less the elements of any of those offenses. The O'Neills should at the very least have had some document memorializing the agreement with Meloche so that, in the event charges were later brought against them, they would have the ability to plead *res judicata*.

Because of the confluence of the questionable circumstances under which this "deal" allegedly occurred, we conclude that the lack of notice was unconstitutional. The O'Neills, therefore, have adequately pleaded a procedural due process violation.

## E.     Substantive due process and equal protection claims

As for the O'Neills' other two Fourteenth Amendment claims, however, we agree with the district court that they are without merit. In both their substantive due process and equal protection claims, the O'Neills argue that there is no rational basis for requiring the alteration of impounded, unaltered adult dogs but not the alteration of impounded, altered adult dogs. This argument is based on the O'Neills' strained reading

of *Louisville Kennel Club v. Louisville/Jefferson County Metro Government*, No. 3:07-CV-230-S, 2009 WL 3210690 (W.D. Ky. Oct. 2, 2009) (unpublished opinion), in which the Kennel Club challenged LMCO § 91.022(A)(1) on substantive due process and equal protection grounds. That now-defunct section of the animal-control ordinance required the owners of unaltered dogs, but not the owners of altered dogs, to obtain written approval of enclosures for their dogs. *Id.* at *8. Admitting that there was no defensible reason for that provision's distinction between unaltered and altered dogs, the municipal government conceded that the requirement was "a redundant nullity." *Id.* The court decided that because the municipality "renounced the value of the section," there was indeed no rational basis for the provision and declared it unconstitutional. *Id.*

But this limited holding does not, as the O'Neills argue, establish that *any* distinction between the owners of unaltered and altered dogs is without a rational basis. In reality, the Louisville/Jefferson County Metro Government has a completely rational basis not to require the alteration of already altered dogs: the alteration of already spayed or neutered dogs is physically impossible. Accordingly, we conclude that these claims were correctly dismissed.

**F.      State-law claims**

The district court determined that the state-law tort claims of trespass, conversion, and outrage were not viable under Kentucky law because the O'Neills were operating a Class A kennel without a license. Because we have concluded, based on the alleged facts, that the O'Neills were *not* operating a Class A kennel, we vacate the district court's ruling on the state-law claims and remand them for reconsideration in light of our contrary decision on the Class A kennel issue.

**G.      Qualified immunity**

Although the district court concluded that there was "no need . . . to consider" the qualified-immunity defense in light of its determination that no constitutional violations had occurred, it went on to state that there was no caselaw clearly establishing

the alleged unconstitutionality of the individual LMAS officers' actions. This latter ruling was unnecessary to the court's decision on this issue and thus dicta. *See United States v. McMurray*, 653 F.3d 367, 375-76 (6th Cir. 2011) (concluding that statements in a prior opinion were dicta because they were not necessary to the outcome of the case). Given that we are reversing the court's rulings on the Class A kennel issue, the consent-once-removed doctrine, and procedural due process issue, the court's analysis of the O'Neills' Fourth Amendment and procedural due process claims will necessarily change, as will its determination of what law was or was not clearly established. We accordingly remand the qualified-immunity issue to the district court for further proceedings in light of our opinion.

## III. CONCLUSION

For all of the reasons set forth above, we:

A.     **AFFIRM** the dismissal of the portion of the Fourth Amendment claim that arises out of the undercover LMAS agents' initial entry into the O'Neills' home;

B.     **AFFIRM** the dismissal of the O'Neills' substantive due process and equal protection claims;

C.     **REVERSE** the application of the Class A kennel designation to the O'Neills' home;

D.     **REVERSE** the dismissal of the portion of the Fourth Amendment claim that arises out of the LMAS officers' second entry into the O'Neills' home;

E.     **REVERSE** the dismissal of the procedural due process claim;

F.     **VACATE** the dismissal of the O'Neills' state-law claims and the district court's dicta regarding the grant of qualified immunity to the individual defendants; and

G.     **REMAND** the case for further proceedings on items D, E, and F in a manner consistent with this opinion.