NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0001n.06

No. 19-5500

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CINDY KING,

      Plaintiff-Appellant,

v.

MONTGOMERY COUNTY, TENNESSEE, et al.,

      Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)

**FILED**
Jan 03, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

---

**BEFORE:**    **SUTTON, NALBANDIAN, and READLER, Circuit Judges.**

**CHAD A. READLER, Circuit Judge**. For their unconditional loyalty and companionship, dogs are perhaps the best friends one can have. But as this case suggests, we are not always so kind in return.

Plaintiff Cindy King regularly kept up to fifteen dogs in her home. Regrettably, those dogs lived in squalor, sometimes without food or water, and oftentimes covered in feces. One of King's associates became aware of these horrific conditions and made a call to 911. Officers rushed to rescue five of the dogs King had left at home while traveling. Soon thereafter, King was indicted on ten counts of animal cruelty. But she escaped any criminal penalty after the state trial court concluded that the officers' entry, which occurred without a warrant, violated the Fourth Amendment. The case was soon dismissed.

King then brought claims under 42 U.S.C. § 1983 against the responding officers, other County officials, and the County itself, alleging violations of her Fourth and Fourteenth

Amendment rights. Following discovery, the district court granted summary judgment to all Defendants. Finding no factual or legal error in the district court's decision, we **AFFIRM**.

## I. BACKGROUND

Cindy King regularly kept fifteen dogs at her home in Clarksville, located in Montgomery County, Tennessee. Of the fifteen, six were under her care as a foster owner for local animal rescue groups. The remaining nine belonged to her or her family.

With plans to travel to Kentucky, King arranged for friends to care for the dogs during her absence. But things did not go according to plan. While in Kentucky, King ran into legal trouble and was temporarily imprisoned. Aware that she would be away from home longer than expected, King called Carolyn Will, a friend who was keeping five of King's dogs. King told Will that she had arranged for Trisha Davids, another friend, to stop at King's home to care for five other dogs who remained there. Will called Davids, only to learn that Davids was unable to tend to those dogs. Agreeing that Will should assume that responsibility, Davids gave Will access information for King's home.

When Will arrived at the home, she found more than she bargained for. The house was in horrific disrepair. And the dogs were suffering in squalid conditions. She took pictures to document what she saw. Dog feces and urine covered the floor. Strong ammonia fumes made it hard to see and breathe. And a dog was caged without access to food or water. Believing that all five dogs in the residence required immediate veterinary attention, Will called 911.

Clarksville Officer John Matos responded to the call. Will explained that King, who lived in the residence, was currently in custody in Kentucky, and that Will had been tasked with caring for the dogs inside. Matos could smell strong ammonia fumes from outside the residence. And

Will graphically described what she had seen inside: appalling conditions, a lack of food and water, and dogs in various stages of ill-health.

Will then opened the door. Through the open door, Matos could see trash and dog feces covering the floor, as well as the caged dog. Entering the home, he saw more of the same, including a dog trapped upstairs in a feces-covered room and a refrigerator infested with cockroaches. Matos took pictures of the conditions and, in turn, contacted Montgomery County Animal Control (or "MCAC").

MCAC officer Jessica Cook received Matos's call. Matos relayed the information he had received from Will and recounted his own experience inside King's residence. Will then let Cook inside the home to perform a welfare check. Cook took several photographs of the conditions inside and texted them to her supervisor, Jannette Farrell. Cook determined that the foul conditions threatened the dogs' health. On that basis, Cook took the dogs into MCAC custody.

The next day, Will, along with Honesty Patrick, who had been housing two of King's dogs, surrendered the seven dogs in their collective care to MCAC. Of the twelve dogs now in their custody, MCAC returned three to the rescue organizations for which King was fostering the dogs—including one to Chinese Shar-Pei Network, (or "CSN"). That same day, King returned to Clarksville. Stacey Seery, another friend, returned to King the three dogs she had been housing in King's absence. CSN, however, informed MCAC that those dogs belonged to CSN and asked MCAC for assistance in recovering them. King ultimately surrendered the three dogs to MCAC.

Meanwhile, photographs of the conditions inside of King's home became a topic of discussion in Clarksville. The photographs were disseminated online, with the parties disputing the original source. In addition, a local newspaper published an article featuring a photograph of the feces-covered room. Shortly after the article was published, King lost her job.

Word of King's misconduct culminated in her becoming the subject of criminal proceedings. King was indicted on ten counts of animal cruelty, and her dogs were retained by MCAC after an impoundment hearing. But King ultimately escaped criminal punishment. The state trial court concluded that the search of King's home violated the Fourth Amendment and accordingly suppressed all of the related evidence. The prosecution in turn dismissed the charges.

As the criminal process played out, the County cared for the impounded dogs, and it accumulated a large debt in doing so. To cover those costs, the County was granted a $10,000 security bond against King. T.C.A. 39-14-210(g)(1)(B). The bill was too much for King to foot, meaning the dogs were deemed abandoned. *See* T.C.A. 39-14-210(g)(2). Nonetheless, MCAC, after repeated correspondence with King's attorney, released five of the dogs back to King, the other ten previously having been returned to their rightful owners or adopted.

King then filed this § 1983 action asserting claims under the Fourth and Fourteenth Amendments. She alleged that: (1) Matos and Cook unlawfully searched her home without a warrant; (2) Cook unlawfully seized the dogs in her home without a warrant or due process of law; (3) Cook and Farrell unlawfully seized ten dogs later surrendered to MCAC without a warrant or due process of law; and (4) Cook and Farrell violated her right to privacy by circulating on social media pictures of her home. King also brought a *Monell* claim against Montgomery County, based upon the actions of County employees Cook and Farrell, and on the basis that the County maintained an animal-impoundment procedure that violated King's due process rights.

After discovery, all parties moved for summary judgment. Matos, Cook, and Farrell did so on the basis of qualified immunity. The district court agreed with Defendants that none of King's constitutional rights were violated. With respect to the Fourth Amendment claims, the district court found that Matos and Cook's entry into King's home and Cook's seizure of the five

dogs inside was supported by readily apparent exigent circumstances that gave rise to probable cause. And as to the remaining dogs surrendered to MCAC, the district court concluded they were not "seized" for Fourth Amendment purposes.

With respect to King's Fourteenth Amendment procedural due process claims, the district court concluded that the impoundment hearing regarding the dogs seized from King's home satisfied her due process rights. As for the remaining dogs surrendered to MCAC, the district court concluded that withholding the dogs from King did not comply with the County's animal control regulations. As such, it was a "random, unauthorized" due process violation by individual County employees governed by *Parratt v. Taylor*, 451 U.S. 527, 541 (1981) (overruled on other grounds). But because King failed to show that she had no adequate remedy under Tennessee law to recover for the deprivation of her dogs, the district court ultimately rejected her due process claim.

The district court likewise rejected the idea that Matos, Cook, and Farrell violated King's Fourteenth Amendment right to privacy. No case, the district court concluded, stood for the proposition that the government violates the Constitution by making pictures of a crime scene public. Likewise, because none of these alleged constitutional violations occurred pursuant to a policy, procedure, or custom of Montgomery County, the district court dismissed King's *Monell* claim. King appealed.

## II.     ANALYSIS

Government actors are entitled to immunity from civil liability for official acts that do not violate clearly established constitutional rights. *See Walker v. Davis*, 649 F.3d 502, 503 (6th Cir. 2011). Whether immunity attaches turns on the answers to two related questions: (1) did the government actors violate a constitutional right; and (2) was that right clearly established at the time the alleged violation occurred? *Baynes v. Cleland*, 799 F.3d 600, 609–10 (6th Cir. 2015). If

the answer to either of those questions is negative, the claims against the officials may not proceed to trial. *See id.*

The district court concluded that King's claims failed the first inquiry because none of the Defendants violated King's constitutional rights, even on the version of events set forth by King. Reviewing the district court's decision de novo, *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008), we agree.

**A. King's Fourth Amendment Claims.**

1. *Neither The Warrantless Entry Into King's Home Nor The Seizure Of The Dogs Inside Violated The Fourth Amendment.*

The Fourth Amendment protects individuals against unreasonable governmental searches and seizures. U.S. Const. amend. IV; *Kentucky v. King*, 563 U.S. 452, 459 (2011). As a threshold matter, it bears noting that the state court held that the search of King's home did violate the Fourth Amendment. We have previously held that preliminary hearings regarding probable cause can bar a party and those in its privity from re-litigating the issue in a related action brought under 42 U.S.C. § 1983. *See Smith v. Thornburg*, 136 F.3d 1070, 1077 (6th Cir. 1998) (holding that the result of a state court's finding of probable cause to prosecute at a preliminary hearing precluded the parties from re-litigating the issue for purposes of a malicious prosecution claim under § 1983). Preclusion arguments, however, must be raised at the pleading stage. *Cf. McCormick v. Braverman*, 451 F.3d 382, 396 (6th Cir. 2006) (citing *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997)). Because King failed to raise the issue below (or in her opening brief on appeal), it is waived, and we will not consider it here. *Hutton v. Mitchell*, 839 F.3d 486, 498 (6th Cir. 2016) (overruled on other grounds) (internal citation omitted). Accordingly, we take up the probable cause determination anew.

In addition to securing a warrant, courts have recognized a number of alternative grounds that can validate a search for Fourth Amendment purposes. One of those is exigent circumstances. *King*, 563 U.S. at 460. The district court concluded that exigent circumstances justified Matos and Cook's entry into King's home. We agree.

*Matos.* Where a need for immediate action by government personnel makes obtaining a search warrant impracticable, those "exigent circumstances" can justify a warrantless entry. *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 490 (6th Cir. 2014). Examples of exigent circumstances include situations in which officers have "the need to assist persons who are seriously injured or threatened with such injury." *Kovacic v. Cuyahoga Cty. Dep't of Children and Family Servs.*, 724 F.3d 687, 695 (6th Cir 2013) (quoting *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010)). This exception to the warrant requirement also allows officers to ensure the safety of animals exposed to dangerous exigent circumstances. *See United Pet Supply*, 768 F.3d at 490.

To our eye, the circumstances described to Matos would have led a reasonable officer to believe the dogs inside the home were in danger. Will told Matos that ammonia fumes made it difficult to breathe, that some of the dogs did not have food or water, and that the dogs needed urgent veterinary attention. Even while outside, Matos could smell the ammonia fumes himself. Will's statements thus sufficiently apprised Matos of the seriousness of the situation.

Whether Matos over-estimated the danger the dogs actually faced is immaterial. *See United States v. Brown*, 449 F.3d 741, 750 (6th Cir. 2006) (holding that an officer's warrantless entry into a home in response to a false alarm by a burglary-prevention system was nevertheless justified by exigent circumstances). The point of the exigent circumstances doctrine is to allow an officer to respond to a potential emergency. *See id.* at 749–50. The circumstances may ultimately

prove less dire than imagined. *See id.* But we do not review an officer's actions with the benefit of hindsight; we instead put ourselves in her shoes. *Id.* Nor do we fault an officer for bracing for the worst. True emergencies do not lend themselves to extensive reflection; delay can mean the difference between life and death. *See United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996) (quoting *United States v. Johnson*, 9 F.3d 506, 508 (6th Cir. 1993) (discussing "inherent necessities")). So long as officers make reasonable efforts to gather information before acting, the Constitution is no obstacle. *See Brown*, 449 F.3d at 749–50.

*Cook.* The same goes for Cook, the animal control officer. Cook reasonably relied on statements from both Will and Matos in entering the home. A reasonable officer in her position would have believed that the dogs inside were in danger. Cook's entry, therefore, was also consistent with the Fourth Amendment. *See id.*

Nor did Cook run afoul of the Fourth Amendment in seizing the dogs inside the home. Exigent circumstances can also justify the warrantless seizure of endangered animals. *United Pet Supply*, 768 F.3d at 490. In *United Pet Supply*, we found that officers did not violate the Fourth Amendment by removing animals from a squalid pet store given the officers' reasonable belief that the animals were in danger. *Id.* So too today. Once Cook entered the home and saw the foul conditions, she reasonably believed that allowing the dogs to remain in the home risked their lives. Under the circumstances, it would have been impracticable for Cook to seek a warrant before removing the dogs from the residence. Doing so thus did not violate the Fourth Amendment. *Id.*

2. *MCAC Did Not Unreasonably Seize The Other Ten Dogs That Were Surrendered To It.*

Property voluntarily surrendered or abandoned is not "seized" within the meaning of the Fourth Amendment when recovered by law enforcement. *See, e.g.*, *United States v. Martin*, 399 F.3d 750, 753 & n.1 (6th Cir. 2005) (citing *United States v. Collis*, 766 F.2d 219, 220–22 (6th Cir.

1985)). Equally true, property left in the custodial care of another is not unlawfully searched or seized when the custodian gives consent. *United States v. Ayoub*, 498 F.3d 532, 539 (6th Cir. 2007) (citing 5 Wayne R. LaFave, *Search and Seizure* § 8.6 (4th ed. 2004)). Because the dogs at issue here were surrendered to MCAC either by individuals whom King had entrusted with their care or by King herself, they were not unreasonably seized for Fourth Amendment purposes.

## B. King's Fourteenth Amendment Due Process Claims.

King also finds constitutional fault, this time by way of the Fourteenth Amendment's procedural Due Process Clause, in the impoundment of the fifteen dogs she regularly housed. To establish her claim, King must show that: (1) she had a life, liberty, or property interest protected by the Due Process Clause; (2) she was deprived of that interest; and (3) the state did not afford her adequate procedural rights prior to depriving her of the property interest. *O'Neill v. Louisville/Jefferson Cty. Metro Gov't*, 662 F.3d 723, 732 (6th Cir. 2011) (quoting *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009)). We assume, for today's purposes, that King had a property interest in each of the dogs. That said, it is necessary, for purposes of our review, to divide the dogs into two groups: (1) the five dogs seized from King's home immediately after the 911 call, and in conjunction with the subsequent criminal proceedings; and (2) the ten dogs surrendered to MCAC days later.

*The Five Dogs Taken In Conjunction With The Criminal Proceedings*. As to the seizure of these dogs, King fails to establish the first element of a due process claim, namely, that she had a property interest *protected by the Due Process Clause*. *Id.* Though we assume King had a property in the dogs, because the dogs were seized as part of criminal proceedings, that property interest was protected by the Fourth (not the Fourteenth) Amendment. *See Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 313 (6th Cir. 2005) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 125

n.27 (1975) ("The Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the process that is due for seizures of persons or property in criminal cases.") (internal quotations omitted)). We have already observed that Matos and Cook complied with the Fourth Amendment. King thus was not entitled to additional process before the dogs were initially seized. *Id.*

Moving beyond the initial seizure, King alleges that MCAC's handling of the dogs was inconsistent with due process. In particular, she claims one dog was adopted out without a hearing almost immediately after being seized. But taken in context, King fails to show constitutionally inadequate process. Whether King was given notice and the opportunity to be heard "at a meaningful time and in a meaningful manner" turns in part on the nature of the purported violation. *Garcia v. Fed. Nat. Mortg. Ass'n*, 782 F.3d 736, 740–41 (6th Cir. 2015) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Deprivations that result from concrete governmental policies require a more demanding due process inquiry. *See Parratt v. Taylor*, 451 U.S. 527, 541 (1981) (overruled on other grounds); *see also DiLuzio v. Village of Yorkville*, 796 F.3d 604, 613–14 (6th Cir. 2015) (examining a village mayor's actions through the lens of *Parratt* but concluding that the challenged action was not random or unauthorized). But that is not what King alleges. She does not, for instance, cite a Montgomery County policy that provides for impounded animals being given up for adoption immediately upon seizure. Rather, she characterizes the adoption here as simply occurring before a hearing was possible. In other words, she alleges a one-off instance of purported misconduct the County was largely powerless to anticipate.

In that irregular circumstance, one driven more by human error than by adherence to a flawed governmental policy, before we intervene, we require that the plaintiff demonstrate that the state in which the error occurred—here Tennessee—affords her no adequate remedy. *See Daily*

*Servs., LLC v. Valentino*, 756 F.3d 893, 909–10 (6th Cir. 2014) (citing *Parratt*, 451 U.S. at 544). King cannot meet that burden. She has not shown why, for instance, she could not have pursued a state-law conversion claim, or alternatively, sought the return of her dog through a state-law replevin action. *See Pero's Steak and Spaghetti House v. Lee*, 90 S.W.3d 614, 623 (Tenn. 2002) (internal citation omitted) (outlining the elements of a conversion claim); *see also McQuiston v. Ward*, Case No. M2001-00201, 2001 WL 839037, at *1 (Tenn. Ct. App. July 25, 2001) (citing T.C.A. 29-30-101) (recognizing a former criminal defendant's right to file a replevin action but dismissing it as barred by the statute of limitations). It may be, as King contends, that Tennessee replevin actions may not be filed while criminal proceedings are pending. But she could have brought such an action immediately after her criminal proceedings concluded. *See id.* at *1. It may likewise be that a conversion claim could not make King entirely whole for the loss of her dog. But her remedy need not be as robust or comprehensive as § 1983 relief to be viable for *Parratt* purposes; it need only comply with due process. *See Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995). King has not shown why she is unable to seek relief under state law to regain possession of the dog, or why such relief, if she could pursue it, would be inadequate under the Fourteenth Amendment. Her claim therefore fails. *See Daily Servs.*, 756 F.3d at 909–10.

Beyond the dog in question, King has made no effort to demonstrate why the procedures underlying the impoundment of the remaining four dogs—including the impoundment hearing— were insufficient under the Fourteenth Amendment. Because we find no constitutional violation in the actions of the Montgomery County employees or County impoundment procedures, King's claim against the County fails as well. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).

*The Ten Surrendered Dogs.* King also asserts a due process challenge to the initial deprivation of the remaining ten dogs, which were being kept by friends. Assuming once again that King had a protected property interest in each of the dogs, she nonetheless fails to establish the second due process element—that she was deprived of the dogs as a result of government action. *See O'Neill*, 662 F.3d at 732. All agree that the ten dogs were voluntarily surrendered to MCAC. That fact is critical, as the government does not deprive an individual of property within the meaning of the Due Process Clause when that property is voluntarily surrendered. *See Rhoads v. Bd. of Educ. of Mad River Local Sch. Dist.*, 103 F. App'x 888, 894 (6th Cir. 2004) (citing *Yearous v. Niobrara Cty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997)). Thus, King's due process claim regarding the initial surrender fails.

Because MCAC initially received the dogs through surrender, then, any due process violation would have occurred, if at all, in MCAC's refusal to return the dogs to King. That, along with the decision to send the dogs to permanent homes elsewhere, may well constitute a deprivation for due process purposes. *See O'Neill*, 662 F.3d at 733. But King was afforded adequate process for each of them.

Here again, King runs up against *Parratt*. As the district court observed, MCAC regulations directed MCAC to notify King of the impoundment of her dogs and allowed MCAC to assess fees against King for the animal's care before returning them. If King made no attempt to reclaim her dogs, as Defendants suggest, she has no basis to sue government actors, as she would have effectively surrendered her interest in the dogs. *See Rhoads*, 103 F. App'x at 894. And even if she did make such an attempt, an unidentified MCAC employee's decision to withhold the dogs from her is another example of a one-off, unauthorized action we afford state procedures the

chance to correct. *Parratt*, 451 U.S. at 544. King must therefore show that she has no adequate Tennessee remedy to prevail in her § 1983 claim.

That burden is too much for King to bear. Her main response is to note that she was unable to pursue a state remedy because she was out of a job after the photographs depicting the conditions in her home became public. Setting aside the fact that King has only herself to blame for those conditions, it bears noting that, generally speaking, there is no hardship exception to *Parratt*'s requirements. At best, King has shown that she was unable to pursue Tennessee remedies, not that those "remedies for redressing the wrong are inadequate." *Jefferson v. Jefferson Cty. Pub. Sch. Sys.*, 360 F.3d 583, 585 n.5 (6th Cir. 2004) (quoting *Victory v. Walton*, 721 F.2d 1062, 1066 (6th Cir. 1983)). So her due process claim fails as well.

## C. King's Fourteenth Amendment Privacy Claim.

King's privacy claim turns largely on the public circulation of pictures of her home. Assuming for purposes of argument that government officials were responsible for their circulation, King's argument still fails.

The Fourteenth Amendment's Due Process Clause encompasses a substantive right to privacy. *Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008). But we read that protection with restraint. That is, to invoke substantive due process protections, a purported privacy right must implicate one of the three fundamental items protected by that clause—life, liberty, or property. *See id.* at 443 (citing *Does v. Munoz*, 507 F.3d 961, 965 (6th Cir. 2007)).

The privacy rights we have recognized to this point fall into two camps: (1) the freedom to make certain fundamental life decisions; and (2) protection against disclosure of deeply personal matters. *Id.* at 440 (quoting *Whalen v. Roe*, 429 U.S. 589, 599–600, 603–04 (1977)). Only the latter could arguably apply here. And even then, that camp has been limited to cases that involve

13

firmly rooted liberty interests. *Id.* at 440. In other words, instances when the disclosure of personal information: (1) could lead to bodily harm to the plaintiff; or (2) implicates matters of a sexual, personal, and humiliating nature.

The privacy right King asserts here pales in comparison. Dissemination of incriminating (and surely embarrassing) pictures may well impact one's reputation. But we have rightly refused to recognize a reputational right to privacy—even in far more compelling circumstances. In *Lambert*, for instance, we denied a privacy claim brought by an Ohio man whose social security number was made publicly available by government officials, leading to theft of his identity. 517 F.3d at 435. Good credit, we observed, while helpful to everyday life, is not a fundamental right protected by the Due Process Clause. *Id.* at 444.

Nor is the dissemination of photographs of one's home. At the time the photographs were disseminated, King was the subject of a criminal investigation. Even if she did have some privacy interest in her home, that interest was far outweighed by the public's right to be aware of crimes committed in their community. We see no reason to extend the right to privacy to shield suspected criminals from unaltered photographs disseminated during a criminal investigation.

### III. CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.